**FRONTIER ROCK & SAND, INC., Appellant,**

v.

**HERITAGE VENTURES, INC., D. Coor, d/b/a Dead Horse Petroleum Supply and Storage, and State of Alaska, Division of Aviation, Appellees.**

**No. 4000.**

Supreme Court of Alaska.

Feb. 29, 1980.

*See* note 1 *supra.*

## OPINION

Ann C. Liburd, R. H. Bussey, Burr, Pease & Kurtz, Inc., Anchorage, for appellant.

Martha T. Mills, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellees.

Before RABINOWTIZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

MATTHEWS, Justice.

Frontier Rock and Sand, Inc. recorded a lien against Lot 1, Block 60, Dead Horse Airport for labor and materials furnished to that property at the request of A & P Griswold Expediters, Inc. Griswold held a lease on the property from the State of Alaska when the work was done, but the state had terminated the lease before the lien was recorded. The question in this case is whether Frontier can recover the value of its work from the state, or from the subsequent lessees of the same property from the state.

There is little dispute over facts. The State of Alaska, Department of Public Works, Division of Aviation, leased property at the Dead Horse Airport to Griswold. The lease agreement required that Griswold construct employee living quarters and a freight warehouse on the site. Frontier Rock and Sand was hired by Griswold to provide the gravel and excavation work required. It completed its work on or before August 27, 1975, but Griswold failed to pay as promised.

Griswold had also failed to comply with a lease requirement that it obtain liability insurance to cover the site. In five letters sent over a four month period, the state notified Griswold of this failure and warned that it would result in cancellation of the lease. Finally, and with ample notice to Griswold, the state terminated the lease as of January 19, 1976. On April 5, 1976, Frontier recorded its claim of lien pursuant to AS 34.35.070.[1] On June 16, 1976, the

---

1. In 1975, AS 34.35.070 provided in relevant part:

(a) An original contractor, after the completion of his contract, and a mechanic, artisan, machinist, builder, lumber merchant, laborer, or other person, claiming the benefit of §§ 50–120 of this chapter, shall file a claim with the recorder of the recording district in which a building or other improvement, or a part of it, is located.

(b) The claim shall be filed within 90 days after

(1) the completion of his contract or the alteration or repair;

(2) he ceases to labor on it from any cause; or

(3) he ceases to furnish materials for it.

. . . . .

(d) The owner of land which may be subject to a lien created under §§ 50–120 of this chapter shall, within 10 days after completion of a building or other improvement, record a notice of completion of the building or other improvement. In order to claim the benefit of §§ 50–120 of this chapter, every original contractor shall record his claim of lien no later than 90 days after the notice of completion has been recorded or within 90 days from completion of work performed at request of the owner, whichever is later. A person, other than the original contractor, claiming the benefits of §§ 50–120 of this chapter shall record his claim of lien no later than 90 days after the notice of completion has been recorded. The notice of completion provided for in this section shall be recorded in the office of the recorder of the district in which the property is situated, shall be signed and verified by the owner or his agent, and shall set out the following:

(1) the date of completion of the building or other improvement, or of a particular portion of the building or other improvement;

(2) the name and address of the owner;

(3) the nature of the interest or estate of the owner;

(4) sufficient legal description of the property; and

state entered into a second lease for the property with Coor and Heritage Ventures.

Frontier filed suit to recover against the state, Coor, and Heritage Ventures. After Frontier's motion for partial summary judgment on the issue of liability was denied, the parties stipulated to judgment in favor of the defendants and that Frontier would be entitled to damages of $53,136 if it prevailed on appeal. The superior court approved this stipulation and this appeal followed.

Three basic issues have been raised. Frontier maintains that it had a valid lien against the Griswold leasehold. It contends that this lien was not extinguished by the state's termination of the Griswold lease, and that the new lease is therefore subject to the lien. Alternatively Frontier argues that cancellation of Griswold's lease without notification to Frontier deprived it of the lien and therefore of a property right without due process of law. And finally Frontier argues that it should be able to recover on a theory of quasi-contract to prevent unjust enrichment of the state.

■ The defendants' first contention is that Frontier filed its lien too late. Resolution of this question requires a discussion of the terms of AS 34.35.070 as it existed in 1975 and 1976. Frontier's lien was filed more than ninety days after it completed its contract and therefore was too late under part (b) of the statute. However, no notice of completion was recorded by the lessee, who is the "owner" for the purpose of sub-

section (d).[2] Frontier argues that because of this its lien was timely, since its lien claim was filed "no later than 90 days after the notice of completion has been recorded" as prescribed by part (d).

Parts (d) through (f) of AS 34.35.070 were added to our lien law by chapter 89 of the 1974 session laws. Frontier contends that the language of subsection (d) augments and expands the time period provided in subsection (b) and that, if the provisions are contradictory, subsection (d) impliedly repealed inconsistent portions of subsection (b). The appellees, on the other hand, contend that the only consistent reading of subsections (b) and (d) is that (d) only applies where a notice of completion has been recorded within ten days after completion of an improvement.

We agree with the appellees' interpretation. Reading subsection (d) as Frontier suggests would result essentially in an unlimited time, or a time limited only by statutes of limitations or laches, within which a materialman's or mechanic's lien might be filed where the owner has neglected to record a notice of completion. Such a result would clearly be inconsistent with the strict deadlines which the legislature has seen fit to observe elsewhere in the lien foreclosure statute. Thus, in addition to the ninety day deadline provided by AS 34.35.070(b) for filing a lien, a lien, once it is filed, is not binding for more than six months unless suit is commenced or unless one six month extension is recorded within the initial six month period.[3] Similarly, an owner is free

(5) the name of the original contractor, if any.

(e) Within five days after recording the notice of completion, the owner shall post a copy of the notice on the property in question and send a copy of the notice to the point of hire if known.

(f) A violation of the provisions of this section places the violator in the position of guarantor regarding another person who suffers damages which are proximately caused by the violation.

Ch. 89, § 1, SLA 1974.

**2.** *See Miller v. Bankers' Mortgage Co.,* 130 Kan. 543, 287 P. 618, 619 (1930).

**3.** AS 34.35.080 provides:

*Duration of lien.* (a) A lien provided for in §§ 50–120 of this chapter does not bind a building, structure, or other improvement for more than six months after the lien is filed, unless suit is brought before the proper court to enforce the lien

(1) within that time, or

(2) within six months after recording of an extension notice in the same recording office within the original six-month period showing the recording date and the book and page or instrument number of the initial claim, and the balance owing.

(b) No lien may be continued in force for more than one year from the date of the filing of the original lien notice.

to pay a prime contractor his full contract price after ninety days has elapsed from the completion of the improvement without risking the burden of double payment if no liens are by then filed.[4] Moreover, the general philosophy of lien statutes is consistent with a system of distinct deadlines for lien filings and inconsistent with open-ended ones. That philosophy is that a material-man or workman may reach the property which he has benefited to satisfy his claim for the benefit even when there is no direct contractual relationship between him and the owner of the property,[5] and regardless of who the owner might be.[6] However, because of the extensive uncertainty to titles that this broad remedy entails it has been thought necessary to construe time limitations for its exercise rather narrowly.[7]

Further, under Frontier's interpretation, subsection (d) would have to be read as applying a ninety day deadline to an event which might never occur. This strikes us as an unnatural use of the language. Beyond that, we observe that part (d) requires the owner in mandatory language to record a notice of completion within ten days after completion. Part (f) provides for what shall happen when the owner fails to do this. He is placed in the "position of guarantor regarding another person who suffers damages which are proximately caused" by his failure.[8] Placing personal liability on the owner who fails to file a notice of completion does give the lienor who does not have a contractual relationship with the owner an added remedy, and it does so without clouding titles and thus potentially

---

4. AS 34.35.090 provides:

    *Payment to contractor.* A payment by the owner of a building or structure to a prime contractor or subcontractor, made before 90 days from the completion of the building, is not valid to defeat or discharge a lien created by §§ 50–120 of this chapter in favor of other claimants, unless the payment is distributed among the other claimants. If a payment is distributed in part only, then the payment is valid only to the extent, it is distributed. *See First Nat'l Bank v. Hilliboe,* 17 N.D. 76, 114 N.W. 1085, 1087 (1908).

5. *Shelton Engin. Contrs., Ltd. v. Hawaiian Pac. Indus., Inc.,* 51 Haw. 242, 456 P.2d 222, 225–26 (1969).

6. *See Lenexa State Bank & Trust Co. v. Dixon,* 221 Kan. 238, 559 P.2d 776, 780 (Kan.1977); *Metropolitan Water Co. v. Hild,* 415 P.2d 970, 972–73 (Okl.1966).

7. *Diamond Nat'l Corp. v. Dwelle,* 164 Conn. 540, 325 A.2d 259, 261 (1973); *Jack Stilson & Co. v. Caloosa Bayview Corp.,* 278 So.2d 282, 283 (Fla.1973); *R. H. Freitag Mfg. Co. v. Boeing Airplane Co.,* 55 Wash.2d 334, 347 P.2d 1074, 1077–78 (1959). *Cf. H.A.M.S. Co. v. Electrical Contrs. of Alaska,, Inc.,* 563 P.2d 258, 262–63 (Alaska 1977) (although provisions of lien statute which define extent of benefits should be liberally construed, provisions determining eligibility for benefits are strictly construed); *Lemire v. McCollum,* 246 Or. 418, 425 P.2d 755, 759 (1967) (same); Comment, *Mechanic's Liens—Judgment Priority—Rights Under Unexecuted Mechanic's Lien Judgment Prior to Executed General Judgment,* 14 Rutgers L.Rev. 813, 814 (1960) (since lien statute creates encumbrance on property of one person for debt

not contracted by him, strict compliance with statute is necessary for creation of lien).

Although lien statutes have generally withstood constitutional attacks based on the claim that the lien deprives an owner of a property right without due process of law, courts have frequently recognized the heavy burden a lien may place on the owner's title. *See, e. g., Connolly Dev., Inc. v. Superior Court,* 17 Cal.3d 803, 132 Cal.Rptr. 477, 553 P.2d 637, 642–44 (1976); *Borchers Bros. v. Buckeye Incubator Co.,* 59 Cal.2d 234, 28 Cal.Rptr. 697, 379 P.2d 1, 4 (1963). In *Connolly,* the California Supreme Court, in holding that filing of a mechanics' lien was a significant deprivation of a property right, stated:

    [A]lthough the imposition of a mechanics' lien does not deprive the owner of the interim use of his property, it may severely hamper his ability to sell or encumber that property. Subsequent purchasers whose title will be subject to the lien may be unwilling to purchase a lawsuit with the land; lenders may refuse a loan on property subject to lien claims; the owner may in some cases be forced to pay a possibly invalid lien in order to clear title to his property in time for a pending transaction to be consummated.

*Id.* 132 Cal.Rptr. at 483, 553 P.2d at 643 (footnote omitted).

Although the court in *Connolly* found a taking of a significant property interest, it upheld the lien statute, finding that, in light of statutory safeguards, and when weighed against the interests of lien claimants and the state, the statute complied with the requirements of due process. 132 Cal.Rptr. at 493–494, 553 P.2d at 653–54.

8. *See* note 1, *supra.*

working prejudice to the rights of innocent third parties. This is the only consequence which the legislature has specified as flowing from an owner's failure to record a notice of completion within ten days, and we think it was the only one that was intended.

We observe finally that the legislature amended subsection (d) in 1977 to provide as follows:

> The owner of land which may be subject to a lien created under §§ 50–120 of this chapter *may,* within 10 days after completion of a building or other improvement, record a notice of completion of the building or other improvement. In order to claim the benefit of §§ 50–120 of this chapter, every lien claimant shall record his claim of lien no later than 90 days after the notice of completion has been recorded or within 90 days of the last occurrence of any event set out in (b) of this section, whichever is *earlier.* (Emphasis added.)

In 1978 subsection (d), along with subsection (e), was repealed entirely. While it is always debatable whether a legislative change is a clarification or a change in substantive law, *see Laborers and Hod Carriers Local 341 v. Groothuis,* 494 P.2d 808, 811 (Alaska 1972), these changes are consistent with the philosophy of requiring definite deadlines in connection with materialmen and laborers' lien laws.

■ Having concluded that Frontier lost any lien rights it may have had by failing to timely file a lien, we now turn to Frontier's claim of unjust enrichment. We think that the court correctly decided that Frontier could not collect from the state under that theory. The general rule is clear: in the absence of anything to show that the landlord ordered or authorized the work, ratified the work after it was done, or was in such a close relationship to the tenant that it can be said that the contract was executed for the landlord's benefit, a plaintiff cannot collect from the landlord under a claim of unjust enrichment, even

where the landlord knowingly acquiesced in and ultimately benefits from the work performed.[9] A landlord is not a guarantor of contracts entered into between his tenants and third parties.

■ Arguably, the state falls within the exception for interested parties under the general rule, as the lease between the state and Griswold specifically required construction of living quarters and a freight warehouse and the laying down of gravel fill. Moreover, the state admits that the gravel fill would be essential to any construction at the site. If the benefit had not been conferred by Frontier, the gravel would still have to be purchased by someone before use could be made of the site. However, it seems clear from the context of the lease provisions that the state was not seeking to have living quarters and a freight warehouse placed on the property when it inserted the building provision in the lease. Rather, it inserted the provision to prevent speculation in state lands. The state was not actively seeking the construction work required by the lease. It was merely willing to lease the property to anyone who could make responsible, productive use of it. The state was not so closely related to the project that it could be considered an intended beneficiary of the contract between Griswold and Frontier.

The judgment is AFFIRMED.

CONNOR, Justice, with whom BOOCHEVER, Justice, joins, dissenting.

I disagree with the result.

I think that the state did benefit from the placement of gravel on the premises, and that the state has a sufficient relation to the project that unjust enrichment will occur if Frontier's claim is disallowed in its entirety.

It appears that the provision calling for construction of employee living quarters and gravel fill was beneficial to the state.

---

**9.** *Puttkammer v. Minth,* 83 Wis.2d 686, 266 N.W.2d 361, 365 (1978); .Dawson, *The Self-* *Serving Intermeddler,* 87 Harv.L.Rev. 1409, 1449–50 (1974).

While it may be true that the specific use provided for in the lease was that contemplated by Griswold, the lessee, it is also true that the state would only authorize those uses which would be of benefit to the development of the airport. To say that the state "was merely willing to lease the property to anyone who could make responsible, productive use of it," is not the whole picture. Rather, the state was willing to lease to anyone who would make use of the property which would benefit the Division of Aviation.

Moreover, the work that was actually done, gravel and excavation work, was *specifically* required for the benefit of the state. The lease provides that the lessee must "place at least five (5) feet of gravel fill on the leased premises without disturbing the existing surface cover of the land . . . and fine grade shall be subject to the approval of the Lessor." The state admits that the gravel fill would be essential to *any* construction at the site, and so if the benefit had not been conferred by Frontier Rock the gravel would still have to be purchased by someone before the use could be made of the site. Thus, it appears that the purpose of this lease provision was not only to benefit the lessee, but also to improve the lessor's existing land.

In conclusion, I believe this is the type of situation that was intended to fall within the interested party exception applied by some courts and referred to by Professor Dawson in his article *The Self-Serving Intermeddler,* 87 Harv.L.Rev. 1409, 1455–56 (1974). The work was ordered, authorized and ratified by the state in such a manner that it can fairly be said that the contract was executed for the benefit of the landlord as well as the lessee.

Given the record, I think we should reverse and direct the entry of judgment for the plaintiff.