INDUSTRIAL POWER & LIGHTING CORPORATION, Alaska Title Guaranty Company and National Bank of Alaska, Appellants/Cross-Appellees,

v.

WESTERN MODULAR CORPORATION, Appellee/Cross-Appellant.

Nos. 4163, 4176.

Supreme Court of Alaska.

Jan. 9, 1981.

William F. Brattain, II, Fairbanks, for appellants/cross-appellees.

Barbara L. Schuhmann, Stephen D. Cramer, Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellee/cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

On or about August 1, 1975, Western Modular Corporation and Industrial Power & Lighting Company made a contract under which Western Modular was to manufacture and sell twenty modular homes to Industrial Power. The total purchase price was $517,270.00. Delivery was to take

place on or before October 1, 1975, and was to be accomplished by presentation to Industrial Power of a final inspection and approval notice issued by the State of Washington, Department of Labor and Industries Factory Built Housing and Commercial Structures Section. Under the contract Western Modular was responsible for the transportation of the modular homes from its factory in Kent, Washington to the dock at Seattle. Industrial Power had the responsibility of arranging for and paying for transportation from the Seattle dock to the homes' final destination in Fairbanks. Industrial Power was to be responsible for all on-site construction. However, Western Modular did warrant the structures to be free from substantial defects and agreed to repair any such defects for a period of one year following delivery.

All twenty of the units were delivered, but Industrial Power did not accept five of them, alleging delivery delay. Western Modular did not receive payment under the contract as scheduled and on April 19, 1976, filed a lien in the total amount of $229,-551.11 against the fifteen lots in Fairbanks where the modular units which had been accepted by Industrial Power had been placed, as well as the five additional lots on which the modular units which had been rejected were to have been placed. This lawsuit soon followed.

While the suit was in its preliminary stages, the parties reached an agreement that was to resolve their dispute. Under the agreement of August 18, 1976, Industrial Power acknowledged indebtedness to Western Modular in the sum of $236,198.29, subject to unresolved back charges claimed by Industrial Power in the amount of $18,-524.04. Further, Industrial Power was to pay Western Modular $25,000.00 at the time the agreement was signed, and deliver a promissory note signed by Industrial Power and co-signed by one Frank McGuire in the amount of $211,198.29 payable with interest on or before October 27, 1976. The note was to be secured by the lien claims filed by Western Modular and by a security interest in the five units that had been rejected by Industrial Power. As to the latter, Indus-

trial Power agreed to accept delivery at Seattle for shipment to Anchorage at Industrial Power's expense. Provision was made in the agreement for release and amendment of Western Modular's claim of lien upon receipt of further payment.

Western Modular received some payments under the promissory note which was part of the August 1976 agreement. However, Western Modular claimed that $85,-945.22 in principal was not paid and sought this amount in an amended complaint.

In its defense to the amended complaint, Industrial Power claimed that the settlement agreement was the product of duress and is therefore unenforceable. In addition, Industrial Power claimed several other affirmative defenses including an allegation that Western Modular was an unregistered contractor that could not maintain the action. Further, Industrial Power asserted a seven-count counterclaim. The first count asserted a claim for breach of contract by delivery delay. Counts II through VII claimed disparagement of title and credit, by reason of defects in the claims of lien, and damages because of noncompliance with various provisions of the Alaska lien statutes.

Industrial Power filed a motion for a judgment on the pleadings and for partial summary judgment based on the fact that Western Modular was not registered as a contractor in the State of Alaska. The court eventually granted summary judgment on that issue and ordered Western Modular's complaint dismissed.

Western Modular then moved for summary judgment dismissing all of Industrial Power's counterclaims because Industrial Power was itself not a registered contractor. The court granted Western Modular's motion, thus effecting a complete dismissal of the case. Both parties have appealed.

Chapter 18, Article I of Title 8 of the Alaska Statutes deals with the registration requirement for construction contractors. Registration is accomplished by submitting an application form to the Department of

Commerce together with a registration fee,[1] a surety bond [2] and evidence of public liability and property damage insurance.[3] There are no competence or experience requirements, except in the case of electrical contractors.[4] It is unlawful to submit a bid or to work as a contractor unless registration has been accomplished,[5] and,

> [n]o person acting in the capacity of a contractor may bring an action in a court of this state for the collection of compensation for the performance of work or for breach of a contract for which registration is required under this chapter without alleging and proving that he was a registered contractor at the time he contracted for the performance of the work.

AS 08.18.151. A contractor is defined as:

> [A] person who, in the pursuit of an independent business, undertakes or offers to perform, or claims to have the capacity to perform, or submits a bid for a project to construct, alter, repair, move or demolish a building, highway, road, railroad, or any type of fixed structure, including excavation and site development and erection of scaffolding; a "general contractor" is a contractor whose business operations require the use of more than two distinct trades whose work the general contractor superintends; the terms "general contractor" and "builder" are synonymous; a "specialty contractor" is a contractor whose operations do not fall within the definition of "general contractor."

AS 08.18.171(2). Section 08.18.161 enumerates fourteen exceptions to the application of Chapter 18. Those relevant to Western Modular's appeal are (5), (6) and (8):

> This chapter does not apply to:
>
> (5) the sale or installation of finished products, materials or articles of merchandise which are not actually fabricated into and do not become a permanent, fixed part of a structure;
>
> (6) construction, alteration, or repair of personal property;
>
> (8) a person who only furnished materials, supplies or equipment without fabricating them into, or consuming them in the performance of, the work of the contractor;

AS 08.18.151 causes the forfeiture of an otherwise valid claim. Because of this, courts have not given similar provisions broad or liberal constructions. *Latipac, Inc. v. Superior Court*, 64 Cal.2d 278, 49 Cal. Rptr. 676, 678, 411 P.2d 564, 566 (1966); *Walker v. Thornsberry*, 97 Cal.App.3d 842, 158 Cal.Rptr. 862, 863 (1979); *Jackson v. Pancake*, 266 Cal.App.2d 307, 72 Cal.Rptr. 111, 113–14 (1968). We agree with those authorities and decline to give the statute an expansive reading.

We believe that the eighth clause listed in AS 08.18.161 exempts Western Modular from registration for the contract in question. The clause exists in substantially identical form in statutes in California [6] and Washington,[7] and has been interpreted there to exempt from registration one who prefabricates but does not install materials which become a part of real property. We find this interpretation persuasive.

Thus, in *Steinbrenner v. J. A. Waterbury Construction Co.*, 212 Cal.App.2d 661, 28 Cal.Rptr. 204 (1963) the plaintiff had custom-fabricated doors, trim, plywood and cabinets, and had delivered them to the building site, but did not participate in their installation. Section 7052 of the Business and Professions Code, as it then provided,

---

1. $100.00 in the case of a general contractor and $50.00 in the case of a specialty contractor. AS 08.18.041.

2. $5,000.00 in the case of a general contractor and $2,000.00 in the case of a specialty contractor. AS 08.18.071.

3. $20,000.00 for property damage, $50,000.00 for injury to one person and $100,000.00 for injury to more than one person. AS 08.18.101.

4. *See* AS 08.18.026; *compare* AS 08.18.021.

5. *See* AS 08.18.011.

6. *See* Cal.Bus. & Prof.Code § 7045(a) (West).

7. *See* RCW § 18.27.090(8), *infra*.

excluded application of the contractor's licensing law to "any person who only furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of the contractor." The court held that this clause exempted the plaintiff from the requirement of obtaining a contractor's license because he had done no installation:

> Steinbrenner was doing nothing other than furnishing materials, albeit custom designed and custom produced, "without fabricating them into, or consuming them in the performance of, the work of the contractor." Ergo, Steinbrenner's activities were exempted by section 7052. To be sure, the products were ultimately fabricated or "consumed," but that event occurred at the hands of Waterbury the licensed contractor, not Steinbrenner, the unlicensed supplier.

*Id.* 28 Cal.Rptr. at 206.

*Harbor Millwork, Inc. v. Achttien*, 6 Wash.App. 808, 496 P.2d 978 (1972) also involved custom-fabricated millwork which was made by a company not licensed as a contractor. Subsection (8) of RCW 18.27.-090 provided that:

> Any person who only furnished materials, supplies or equipment without fabricating them into, or consuming them in the performance of, the work of the contractor ...

was exempted from contractor registration. The court, following *Steinbrenner*, held that this subsection exempted the millwork company for the items which it had fabricated

and delivered, but had not installed. *Id.* at 981.

It is noteworthy that both the California and Washington statutes construed in *Steinbrenner* and *Achttien* contained another exemption, comparable to clause (5) of AS 08.18.161 exempting "the sale or installation of any finished products, materials or articles of merchandise which are not actually fabricated into and do not become a permanent, fixed part of a structure." *Steinbrenner v. J. A. Waterbury Construction Co.*, 28 Cal.Rptr. at 206; *Harbor Millwork, Inc. v. Achttien*, 496 P.2d at 981. The courts noted that, although this clause seemingly overlapped the clause cognate to exception (8), the former was aimed at a supplier who actually installs his products. *Steinbrenner v. J. A. Waterbury Construction Co.*, 28 Cal.Rptr. at 206; *Harbor Millwork, Inc. v. Achttien*, 496 P.2d at 981.[8]

Because Western Modular had no installation responsibilities under its contract of August 1, 1975, we hold that it was not required to register under Chapter 18 in order to obtain payment in compensation for its performance of that contract.[9] The summary judgment in favor of Industrial Power against Western Modular is accordingly reversed.

We turn now to Industrial Power's appeal. At the time Industrial Power made the contract with Western Modular, August 1, 1975, it was not registered as a contractor in Alaska. It applied for certification on September 11, 1975, and its application was approved on September 30, 1975.

---

8. Two Arizona cases are also worthy of mention. In *Pace v. Hanson*, 6 Ariz.App. 88, 430 P.2d 434 (1967), the defendant, who was not licensed as a contractor, was to furnish plaintiffs with a "shell house," that is, a house that was finished on the outside, but the interior of which was completely unfinished. The court held that as a prefabricator of houses, the defendant did not fit within the exemption (analogous to AS 08.18.161(5)) as it then existed, but noted that under the language of the former provision, which was essentially identical to AS 08.18.161(8), "there [was] room for the defendant to argue that he [was] excluded." *Id.* 430 P.2d at 438.

Subsequent to that case, the legislature enacted a provision expressly exempting from

contractor registration, materialmen or manufacturers of finished products, materials or articles of merchandise who do not install them. A.R.S. § 32–1121(6) was construed, as it then provided, in *Porta House, Inc. v. Scottsdale Auto Lease, Inc.*, 120 Ariz. 115, 584 P.2d 579, 581 (Ariz.App.1978), to exempt one who furnished the component parts of buildings which were to be assembled and erected by another.

9. Subsequent to the execution of the contract, Industrial Power did request Western Modular to provide on-site consultation with respect to installation. Such consultation was provided, but plays no part in this case since Western Modular is not seeking compensation for it.

Industrial Power claims that as of August 1 it did not fall within the definition of "contractor" under AS 08.18.171(2) because it was not undertaking to construct a structure.[10] This argument has no merit, for the contract to purchase the prefabricated units was certainly the beginning of Industrial Power's undertaking to accomplish the project it had planned.

▬ Implicit in this conclusion is our belief that the word "undertakes" as it is used in AS 08.18.171(2)[11] is not limited to a contractual undertaking, but must be understood in the more general sense of setting about, engaging in, or entering upon an activity described by the statute.[12] The same interpretation has been given to an analogous Arizona statute in *Matison v. Barassi*, 118 Ariz. 538, 578 P.2d 619 (Ariz. App.1978).[13] There, Barassi bought property which he began renovating prior to any contractual obligations. Subsequently, he contracted to sell the property to Matison. The court rejected Barassi's argument that he did not "undertake" work under the

A.R.S. § 32–1101 since his initial intent was to do the work for himself whereas "undertake" contemplates a situation where work is begun for the benefit of another.[14]

To construe "undertake" in the narrower sense of a contractual undertaking would exempt all professional builders who build on their own property for eventual resale. Such a result is plainly not contemplated by the statute since AS 08.18.161(13)[15] specifically exempts an owner-builder who constructs one building per year. By clear implication such owner-builders would be covered by the statute except for this exemption, and owner-builders who build more than one building per year are covered by the statute.

▬ Similarly, we cannot accept the argument propounded by the dissent that the contract between Industrial Power and Western Modular was not, from the standpoint of Industrial Power, "a contract for which registration is required" within the

---

**10.** Industrial Power does not claim on appeal that it falls within any of the exemptions contained in AS 08.18.161; nor does it claim substantial compliance with the registration requirements.

**11.** See page 294 *supra.*

**12.** This interpretation is in accordance with the first definition of the meaning of the word "undertake" set forth in Webster's New International Dictionary, 2d edition: "to take upon oneself; to engage in; to enter upon; to take in hand; set about; attempt; as, to *undertake* a task, a journey."

**13.** Ariz.Rev.Stat.Ann. § 32–1101 (1972) provided at the time of this case:

In this chapter, unless the context otherwise requires, "contractor" means a person, firm, partnership, corporation, association or other organization, or a combination of any of them, who, for either a fixed sum, price, fee, percentage, bonus or other compensation *other than actual wages, undertakes to or offers to undertake to, or purports to have the capacity to undertake to or submits a bid to,* or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other struc-

ture or works in connection therewith. The term contractor includes subcontractors and specialty contractors.
(emphasis added).

**14.** After the contract was signed for the sale, Barassi continued the renovation he had begun earlier but incorporated specifications requested by Matison. The court ruled that the type of work performed by Barassi fell within the ambit of activities described by A.R.S. § 32–1101 and stated:

We have been directed to no good reason or authority to exempt a contractor from the statute because construction did not begin at the instance of the ultimate purchaser. Such an exemption would conflict with the statutory purpose of protecting the public from unsatisfactory work.

*Matison v. Barassi*, 578 P.2d at 623 (citations omitted).

**15.** As 08.18.161(13) provides:

This chapter does not apply to: ... (13) an owner who acts as his own contractor and in doing so hires workmen on an hourly basis, hires subcontractors, purchases materials, and as such, sees to the paying for all labor, subcontractors and materials; in this case, the owner shall be limited to construction of one home or duplex or one commercial building per year; ...

meaning of AS 08.18.151.[16] The dissent, if we understand it correctly, would exclude the contract in question from this definition because Industrial Power was not committed by the contract to actually build anything. However, a professional builder usually buys construction materials without incurring a contractual obligation to his supplier to perform work. It cannot be argued that such a builder is exempt from the duty of registration.

An example will illustrate this point. Suppose that one situated in the position of Industrial Power intends to do all of the installation work and to utilize no subcontractors. The project involves twenty dwelling units on land owned by the builder. The builder purchases a large quantity of supplies and materials for the project. Under the analysis employed by the dissent, the builder will be totally exempt from registration because it will never enter into an agreement under which it is contractually bound to build. Such a project clearly exceeds the limitations of the exemption granted by AS 08.18.161(13), yet under the dissent's analysis the builder is not required to register and his suppliers are denied the protection afforded by the bond requirements of this chapter.[17]

■ Industrial Power's next argument is that Western Modular may not complain of Industrial Power's nonregistration because Western Modular was not within the class of beneficiaries which Chapter 18 is designed to protect. As discussed, that argument is also without merit because Chapter 18 is plainly designed to protect suppliers of contractors from nonpayment. See AS 08.-18.071(a)(2), AS 08.18.081(a)(3).[18]

■ Industrial Power claims that Counts II through VII of its counterclaim all arise out of the wrongful filing of liens by Western Modular and involve torts or statutory violations that are not barred by the fact of Industrial Power's nonregistration. That argument is well taken. We indicated in *Sumner Development Corp. v. Shivers*, 517 P.2d 757 (Alaska 1974), that an unregistered contractor could maintain an action for deceit against one who had induced him to make the contract with the intention of asserting the statute as a bar to an action to collect payment. *Id.* at 763 n. 17. Other authorities have also held that tort actions, even those having some connection with an underlying contract on which a suit for enforcement is barred, are not precluded by the claimant's failure to observe a licensing statute. *See, e. g., Pickens v. American Mortgage Exchange*, 269 Cal.App.2d 299, 74 Cal.Rptr. 788 (1969) (action for fraud); *Grant v. Weatherbolt*, 123 Cal.App.2d 34, 266 P.2d 185 (1954) (action for fraud); *Mueller v. Burchfield*, 359 Mo. 876, 224 S.W.2d 87 (1949) (action for misrepresentation); *Magill v. Lewis*, 74 Nev. 381, 333 P.2d 717 (1959) (claim of unjust enrichment, based on false representations). *See also, Institute for Essential Housing, Inc. v. Keith*, 76 N.M. 492, 416 P.2d 157 (1966) (action on promissory note). This result is indicated by the express terms of the statute, AS 08.18.151, which precludes only actions "for the collection of compensation for the performance of work or for breach of a contract for which registration is required." Public policy precludes giving this statute anything but a literal reading; it would be unfair to prevent one from recovering damages for the torts of another simply because his contract is unenforceable.

---

**16.** AS 08.18.151 provides:

*Legal actions by contractor.* No person acting in the capacity of a contractor may bring an action in a court of this state for the collection of compensation for the performance of work or for breach of a contract for which registration is required under this chapter without alleging and proving that he was a registered contractor at the time he contracted for the performance of the work.

**17.** The dissent's analysis would have the paradoxical effect of exempting from registration those builders large enough to perform all aspects of construction within their own organization.

**18.** *See also, Lewis & Queen v. N. M. Ball Sons*, 48 Cal.2d 141, 308 P.2d 713, 721 (1957), noting that the class protected by the statute includes those who deal with the person required to have a license.

However, the conclusion that Counts II through VII of Industrial Power's counterclaim are not barred by noncompliance with the contractor registration statute does not end the inquiry. The court held on alternative grounds that those counts could not be maintained because the filing of liens in connection with litigation is a privileged act for which no action in the nature of defamation will lie. We agree and have referred with approval to authorities so holding in *Zamarello v. Yale*, 514 P.2d 228, 230 (Alaska 1973). *See Stewart v. Fahey*, 14 Ariz.App. 149, 481 P.2d 519, 520–21 (1971); *Albertson v. Raboff*, 46 Cal.2d 375, 295 P.2d 405, 408 (1956). The privilege applies even where the lien is deficient, for the privilege is absolute. *See Zamarello v. Yale*, 514 P.2d at 230; *Stewart v. Fahey*, 481 P.2d at 520–21; *Albertson v. Raboff*, 295 P.2d at 408; Restatement of Torts, §§ 587, 638, comment b at 358 (1938); Restatement of Torts 2d § 635 (1977).

This does not mean that Industrial Power may not maintain an action for malicious prosecution if the current litigation is terminated favorably to it, and if malice on the part of Western Modular and lack of probable cause for the claim asserted are pleaded and proven. *Nataros v. Superior Court*, 113 Ariz. 498, 557 P.2d 1055 (1976); *Albertson v. Raboff*, 295 P.2d 405 (Cal. 1956). However, such an action must follow this case and cannot be maintained as a counterclaim, since one of the essential elements of a malicious prosecution claim is that the proceedings must have terminated in favor of the person against whom they were brought. *Kraft v. National Surety Co.*, 75 F.2d 141 (9th Cir. 1935); *Nataros v. Superior Court*, 113 Ariz. 498, 557 P.2d 1055

(1976); *Bollinger v. Jarrett*, 146 Mont. 355, 406 P.2d 834 (1965).

Industrial Power argues, in addition, that Western Modular's lien claims gave rise to a statutory action independent of a common law action for disparagement of title and credit. Industrial Power relies on AS 34.35.070(f) which provides:

A violation of the provisions of this section places the violator in the position of guarantor regarding another person who suffers damages which are proximately caused by the violation.

The violations of section 070 claimed by Industrial Power include failure to properly verify the liens, failure to file them on time, and inclusion of property which did not have units placed upon it. According to Industrial Power, "the fundamental purpose behind AS 34.35.070(f) is to afford redress to a land owner whose property has been illegitimately subjected to a claim of lien and to provide a practical safeguard to assure that the powerful remedy provided to a legitimate lien claimant is exercised in a responsible manner. By enacting AS 34.-35.070(f), the legislature has indicated that one who claims a lien must do so in accordance with AS 34.35.070 or else be financially responsible for the damages occasioned by unauthorized conduct." In addition, Industrial Power argues that section 070(f) eliminates the defense of privilege in disparagement of title actions.

In *Frontier Rock & Sand, Inc. v. Heritage Ventures, Inc.*, 607 P.2d 364 (Alaska 1980), we gave a much more modest interpretation to subsection (f). In that case we noted that subsections (d), (e) and (f) of AS 34.35.-070 were added to our lien law in 1974.[19]

---

19. Subsections (d) and (e) were repealed in 1978 (Ch. 175, § 19 SLA 1978). At the time of this action, they provided:

(d) The owner of land which may be subject to a lien created under §§ 50–120 of this chapter shall, within 10 days after completion of a building or other improvement, record a notice of completion of the building or other improvement. In order to claim the benefit of §§ 50–120 of this chapter, every original contractor shall record his claim of lien no later than 90 days after the notice of

completion has been recorded or within 90 days from completion of work performed at request of the owner, whichever is later. A person, other than the original contractor, claiming the benefits of §§ 50–120 of this chapter shall record his claim of lien no later than 90 days after the notice of completion has been recorded. The notice of completion provided for in this section shall be recorded in the office of the recorder of the district in which the property is situated, shall be

Subsections (d) and (e) imposed an obligation on the owner of property to record a notice of completion of the project in question, to post a copy of the same on the property, and send another copy "to the point of hire if known." We observed in *Frontier* that part (f) of the statute

> provides for what shall happen when the owner fails to do this. He is placed in the "position of guarantor regarding another person who suffers damages which are proximately caused" by his failure. Placing personal liability on the owner who fails to file a notice of completion does give the lienor who does not have a contractual relationship with the owner an added remedy....

*Id.* at 367 (footnote omitted). We adhere to that view of the purpose of subsection (f). The subsection contains only the language of guarantee, not of direct liability. A guarantor is one who assumes collateral responsibility to pay an existing debt which another party owes to a third person, *i. e.,* in the event that the principal debtor does not pay.[20] The term "guarantor" as used in the statute does not express the liability of a wrongdoer to his victim except in the special case where the victim is prevented from collecting a debt owed by another because of the wrongdoer's act. Since that situation does not exist here, we reject Industrial Power's argument that subsection (f) supplies the basis for a claim for relief against Western Modular.[21] We therefore

affirm the summary judgment dismissing the counterclaims of Industrial Power.

The judgment is REVERSED in part, AFFIRMED in part and REMANDED for further proceedings in accordance with this opinion.

RABINOWITZ, C. J., concurs in part, dissents in part.

RABINOWITZ, Chief Justice, concurring in part, dissenting in part.

I concur in the court's conclusion that the statutory bar should not be invoked against Western Modular (WM). I do not agree, however, that Industrial Power & Light (IPL) should be barred. I address the latter issue first.

## I. Application of the Statutory Bar to Industrial Power & Light

In view of the court's pronouncement that the statutory bar is not to be given an expansive reading, or a broad and liberal construction, I think its application to IPL is incorrect.

The statutory provision which imposes the bar reads as follows:

> *Sec. 08.18.151. Legal actions by contractor.* No person acting in the capacity of a contractor may bring an action in a court of this state for the collection of compensation for the performance of work or for breach of a contract for which registration is required under this

---

signed and verified by the owner or his agent, and shall set out the following:

    (1) the date of completion of the building or other improvement, or of a particular portion of the building or other improvement;

    (2) the name and address of the owner;

    (3) the nature of the interest or estate of the owner;

    (4) sufficient legal description of the property; and

    (5) the name of the original contractor, if any.

    (e) Within five days after recording the notice of completion, the owner shall post a copy of the notice on the property in question and send a copy of the notice to the point of hire if known.

**20.** *See* 10 S. Williston, *Law of Contracts,* § 1211 at 685–86 (3d ed. 1967).

**21.** With the repeal in 1978 of subsections (d) and (e) of AS 34.35.070 (*see* footnote 12, *supra*), we recognize that it is difficult, though perhaps not impossible, to imagine a situation to which subsection (f) would apply. We believe that the legislature's failure to repeal (f) was probably an oversight, since (d), (e) and (f) were enacted at the same time with (f) designed as an enforcement measure to compel compliance with (d) and (e). *See Frontier Rock & Sand, Inc. v. Heritage Ventures, Inc.,* 607 P.2d 364, 367 (Alaska 1980). Further, if the legislature had meant subsection (f) to encompass claims in the nature of disparagement of title free from the defense of privilege we believe that intention would have been more directly expressed and language of guarantee would not have been utilized.

chapter without alleging and proving that he was a registered contractor at the time he contracted for the performance of the work.

Thus, to avoid the bar, registration must be effected, not at "the beginning of [the contractor's] undertaking to accomplish the project it had planned," as the majority apparently rules, but rather "at the time he contracted for the performance of the work," with "the work" referring back to the clause "work ... for which registration is required under this chapter." [1]

This specification of the point as of which registration must be accomplished is important, since the statute creates a severe forfeiture and as such "should be strictly construed against the government or parties seeking to exact statutory penalties and in favor of persons on whom such penalties are sought to be imposed." 3 C. Sands, *Sutherland Statutory Construction* §§ 59.02, 59.03 (4th ed. 1974). It lets potential or incipient contractors know when they must obtain registration—*i. e.*, before they can execute any contract for the performance of work covered by the chapter. This leaves them free to engage in any preliminary planning and/or exploratory work, up until the point at which they execute with another party a contract for the performance of work covered by the chapter. This makes sense in terms of the statutory purpose, in that it is these other parties to the contract whom the statute seeks to protect against unscrupulous or incompetent contractors. Thus, the question is whether IPL contracted for the performance of work for which registration is required under the statute, prior to September 30, 1975 (at which point IPL obtained a license).[2]

To find that IPL did contract for the performance of work, work for which registration would be required under the chapter, prior to September 30, 1975, the superior court would have to find either that (1) IPL contracted for the performance of work for which registration is required in the contract of August 1, 1975, between itself and WM; or (2) IPL contracted for the performance of such work in some other contract, presumably with its own customers, prior to September 30, 1975. There does not appear to be sufficient support in the record to warrant summary judgment based upon this second option (*i.e.*, there is a genuine issue as to this material fact); and the majority specifically adopts the first option.

Thus, the bar imposed against IPL because it could not prove that "[it] was a registered contractor at the time [it] contracted for the performance of the work" must be based on the August 1, 1975, contract. Although this contract clearly involves construction-type activities, they are all obligations imposed on WM. It strikes me as meaningless to require one party to a contract to register based on the other party's contractual obligations; in my view such an interpretation would require any purchaser of contractors' services (*e. g.*, a

---

1. The "work" which brings a person within the definition of contractor, *i. e.*, for which registration is required, is "a project to construct, alter, repair, move or demolish a building, highway, road, railroad, or any type of fixed structure, including excavation and site development and erection of scaffolding," according to the definition of "contractor" in AS 08.18.171(2).

2. Because of the wording of the statute, and because of the statutory interpretation principles noted above, these two requirements should be read in the conjunctive—*i. e.*, the court must find both that there was a contract for the performance of work executed prior to September 30, 1975, and that the work under the contract was such that registration would

be required under the chapter. Under this interpretation, if construction work is being done, but there is as of yet no contract, express or implied, between two parties covering the performance of this work, then no registration is required. Indeed, this is made explicit in AS 08.18.161(11), which exempts from the registration requirement "a person working on his *own property, whether occupied by him or not,* and a person working on his own residence, whether owned by him or not." Conversely, if there is a contract between two parties, but it does not require a party to perform work of the type covered by the chapter, then again registration is not required. This latter situation is presented here.

private home-buyer) to register.[3] Thus, IPL's registration requirement must be based on IPL's contractual obligations.[4]

It is clear that no registration requirement was imposed on IPL by virtue of the provisions of the August 1, 1975, contract. As IPL points out, had it decided to place the units in Oregon rather than Alaska, WM would have had no cause of action against IPL for breach of contract; and, in such a case, registration in Alaska would have been entirely unnecessary. Thus, the August 1, 1975, contract did not require IPL to render any performance or do any contractor's work in Alaska for which registration would be a prerequisite.[5]

The superior court did not make any findings to the contrary.[6] Its ruling was apparently based on the theory that, regardless of whether IPL entered into any contractual commitment to perform work for which registration would be required, registration

3. Again, this policy is manifested by an explicit exemption from the registration requirement for "an owner who contracts for a project with a registered contractor." AS 08.18.161(10).

4. The majority states, it cannot be argued that a builder who buys supplies without incurring any contractual obligations to the supplier to perform work is exempt from the duty of registration. This conclusion only flows, I think, if one assumes that there is some other reason why the builder should have registered under AS 08.18.151—i. e., that the builder has entered into some contract, presumably with a consumer, to perform some sort of construction work in Alaska for which registration is required. If that were the case, then the builder would be required to register, and as such, would not be able to bring an action against a supplier on a contract entered into during that period when registration was required, since the statute is to protect suppliers as well as consumers.

However, without some independent reason why the builder should register under AS 08.-18.151, there is in my view no basis to assert that "It cannot be argued that such a builder is exempt from the duty of registration." If an Argentinian builder had bought the homes from WM for placement in Argentina, he would have bought construction materials without incurring a contractual obligation to his supplier to perform work, and he would argue quite persuasively that he did not have to register under AS 08.18.151.

The hypothetical the majority uses to support its position contains several flaws in reasoning. Initially, if the builder intends to do all the installation work and utilize no subcontractors, then why is not that builder exempt under AS 08.18.161(11) ("a person working on his own property, whether occupied by him or not")? In such a case IPL will suffer from its own shoddy or irresponsible workmanship.

The exemption noted by the majority [AS 08.18.161(13)] exempts "an owner who acts as his own subcontractor and in doing so ... hires subcontractors." Thus, by the majority's own suppositions, if the builder hired no subcontractors, then that exemption would, by its terms, be inapplicable. That being the case, it is inaccurate to say that this hypothetical

would, under the rule I would adopt, exceed the limitations of this exemption; it is not subject to the exemption. Even if the hypothetical is modified so that the builder does hire subcontractors, the rule I would adopt would not remove the registration requirement. I think that a contract between a contractor and a subcontractor for work in Alaska commits both parties to a contract for which registration is required; and if one of the parties could not prove it was registered at the time it so contracted, it would be barred, assuming that more than one building per year is involved.

5. I can envision at least one circumstance under which the August 1, 1975, contract might have required registration by IPL. WM gave, under the contract, a warranty for its materials and workmanship. If IPL used the homes in some way not contemplated by the contract, then this might afford WM a defense to IPL's claim under the warranty. As such, if the contract specified that the homes were for use in Fairbanks, and it was clear that WM needed to rely on this location in its agreement to repair under the warranty, but IPL subsequently shipped the homes to Micronesia where WM did not have sufficient facilities and personnel to back up its warranty, then I think it is clear that WM would have a good defense to a warranty claim by IPL. Under such circumstances, the August 1, 1975, contract could be read as one in which IPL contracted for the performance of work for which registration is required—i. e., placement of the homes in Fairbanks, Alaska. However, the August 1, 1975, contract does not specify the eventual destination of the homes, and the warranty is not linked to any particular location.

6. The superior court did find that IPL had undertaken construction of footings and basements as well as site preparation prior to the time it became a registered contractor. There is no indication that IPL was contractually committed to perform this work. If it were, then registration was required; but if it were not, then it was performing its own work on its own land, and thus, registration was not required under AS 08.18.161(11).

was required because of IPL's plan or "purpose." This is implicitly accepted by the treatment given the issue in the majority opinion. I think it is an overbroad statement that the contract between WM and IPL required IPL to register merely because it "was certainly the beginning of Industrial Power's undertaking to accomplish the project it had planned." Unless there was some reason, in the contract itself, why, in the event registration was denied, IPL could not modify or abort the project without breaching its contractual commitments, then such a statement seriously impinges on the flexibility of business decision-makers. It is reasonable to require registration prior to a contractor's making any contractual commitments to do the type of work for which registration is required; it is not reasonable to impose such a requirement, without any contractual commitment to do such work having been made, on the basis of an out-of-state purchase or a plan for a particular project. Such a rule is too vague for practicable enforcement. To be on the safe side, prospective out-of-state contractors would have to register prior to doing any preliminary planning, and this would unduly discourage commerce with Alaska. The requirement of a contractual commitment provides a much more definite and concrete point for the imposition of the registration requirement, and thus makes sense in terms of policy and enforceability considerations, as well as being in accordance with the language of the statute.

II. Application of the Statutory Bar to Western Modular

Although I concur in the majority's conclusion as to the eighth exception to AS 08.18.161 as applied to WM, I wish to add a few observations which I think compel the result reached by the court.

I do not think that the result can be explained on the basis of case law alone. There is, I think, a significant difference between the products involved in the *Steinbrenner*[7] and *Achttien*[8] cases cited in the majority opinion (doors, trim, plywood, and cabinets in *Steinbrenner*, and doors, door jambs, valances, handrails, and cabinets in *Achttien*) and an entire prefabricated house. As the superior court found, "Western Modular did not supply just windows, doors, lumber, and things of that nature .... It supplied a complete house ...."

Similarly, there are significant differences between the statutes in the cases relied upon by the court and the one involved here. For example, the new Arizona statute (noted in footnote 8 of the majority opinion) exempts from registration materialmen or manufacturers of finished products, materials, or articles of merchandise who do not install them. The Alaska statute exempts a person "who only furnished materials, supplies or equipment without fabricating them into, or consuming them in the performance of, the work of the contractor." I think a prefabricated house is easily classified as a "finished product" under the Arizona statute, but I have more problems classifying it as "materials, supplies or equipment" under the Alaska statute. And I can accept the proposition that WM did not "install" the house under the Arizona statute, but it is less explainable how WM prefabricated the houses "without fabricating them" under the wording of the Alaska statute.

Last, I think that the usefulness of similar statutes and prior case law is limited by the imprecision in the use of the word "prefabricate." My reading of the word's definition is that it can refer either to a house completely assembled prior to transport or a house transported in component sections and assembled on-site.[9]

7. *Steinbrenner v. J. A. Waterbury Constr. Co.*, 212 Cal.App.2d 661, 28 Cal.Rptr. 204 (1963).

8. *Harbor Millwork, Inc. v. Achttien*, 6 Wash. App. 808, 496 P.2d 978 (1972).

9. Webster's New World Dictionary (College Ed. 1966) gives two definitions to the word "prefabricate":

(1) to fabricate beforehand. ["Fabricate" is defined in the same dictionary as "(1) to make; build; construct; manufacture. (2) to

Especially in light of the lower court's findings of fact,[10] under which WM would seem to be required to register, I think a fuller explanation should be forthcoming as to why we find on these facts that it was not required to do so.

I think that neither the case law nor the wording of the statute compels a conclusion either way in this case. I can only reach a conclusion by examining the policy tensions underlying this case.

The policy to be served by bringing WM within the scope of the statutory bar—*i. e.*, excluding WM from the exemption—is fairly clear from prior case law. The policy of the statute is to protect the public by ensuring competence and financial responsibility in contractors. *Sumner Development Corp. v. Shivers*, 517 P.2d 757, 763 (Alaska 1974). That the public should be protected from on-site incompetent or irresponsible electricians installing wiring, plumbers installing faucets, carpenters installing wallboard, etc., but not be protected from the same professionals performing the same work off-site, is a distinction without merit as far as protection of the public goes.

On the other hand, the distinction may be given merit by policies apparent from the perspective of firms in WM's position. If such a firm enters into a contract for the sale of a "prefabricated" product like the one involved here, it may not be a good policy to impose a requirement that the firm be registered as a contractor in every state to which the product may be shipped by its buyer. The unduly burdensome nature of such a requirement, and drastic nature of the sanction for non-compliance (forfeiture of claims and defenses), would place an unwarranted damper on technological development and growth in this area.

My suggestion is that resolution of these conflicting policies be made by resort to the particular contract. If the contract specifies that the prefabricated products are to be used in a particular area, and the selling firm's warranty or other contractual provisions clearly contemplate on-site work, then the firm may reasonably be expected to ascertain and comply with the applicable requirements and regulations for conducting such operations in that area. If, on the

make or build by assembling parts: as, we *fabricate* engines."]

(2) to make or build in standardized sections for shipment and quick assembly, as a house.

The first definition would indicate that the assembly was accomplished by WM prior to transfer to IPL; the second would indicate that the component parts of the houses were given to IPL, for on-site assembly.

10. The superior court's opinion stated it was: convinced that Western Modular cannot fit within the [AS 08.18.161(8)] exceptions. Western Modular did not supply just windows, doors, lumber, and things of that nature, which might qualify it as a materialman. It supplied a complete house, knowing full well that the house furnished would be affixed to a foundation in Fairbanks, Alaska, and become a permanent structure.

In addition, Western Modular performed design services for the houses, prepared plat plans showing the setting of a particular house on a particular lot. In connection with other sales of their modular houses within the State of Alaska, Western Modular provided their own employees to assist in the erection of the houses. The original contract between the parties required Western Modular to perform warranty services and it obligated itself to making repairs for any aspect

of the unit which was defective. Leonard Bray, an employee of Western Modular, actually did work on the foundations, shimming them up so that they would be ready to receive the house at the actual site in Fairbanks. George Sullivan ... verified that Western Modular was obligated to do "on-site warranty work." Employees of Western Modular made specific recommendations regarding modifications of the subject units, particularly with reference to the split-entry and the amount of insulation to be installed. Furthermore, he prepared plans for the erection of a basement to go into these particular units, i. e., the foundations.

The foregoing considerations, although they tend to strengthen the defendant's position that Western Modular was in fact a contractor, are essentially immaterial to the Court's decision. The thing that is material is that Western Modular built the entire home; it did not provide lumber, nails, electrical equipment, heating and plumbing to be installed in a structure by someone else—they fabricated the entire home themselves, and it makes little difference that Industrial Power & Light actually took the completed home and placed it on the permanent foundation.

other hand, the contract does not specify a particular location for the placement of the prefabricated product, or no contractual provision reasonably contemplates on-site work by the seller, then no duty to ascertain and comply would attach to the seller.

In this case, the contract did not specify that the homes were to be located in Fairbanks, and additionally a provision put the onus of compliance with local building codes on IPL. As such, I think the court's conclusion is correct.

Thus, I concur in the court's conclusion that the statutory bar should not be invoked against Western Modular, but I dissent from the conclusion that the statutory bar is to be invoked against Industrial Power & Light. I would bar neither party and let the litigation proceed accordingly.