George WIERZBICKI and Deborah Ann Wierzbicki, Appellants,

v.

ALASKA MUTUAL SAVINGS BANK, Appellee.

No. 5621.

Supreme Court of Alaska.

July 17, 1981.

William L. McNall, Law Offices of Vincent Vitale, Anchorage, for appellants.

Brian J. Brundin and Timothy R. Byrnes, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal arises out of claims for relief which the Wierzbickis (home buyers) filed against the Alaska Mutual Savings Bank (construction lender). The Wierzbickis grounded their claims for relief upon allegations that the Bank was negligent in making the construction loan to Burd (an unlicensed, unbonded builder), and that, having extended the loan, it negligently performed its periodic inspections which preceded disbursement of the loan funds. The superior court granted the Bank's motion for summary judgment on these claims. On the basis of this record, we affirm the superior court's grant of summary judgment to the Bank.

### I. Factual Background

After inspecting a model home built by Burd and concluding "preliminary negotiations," the Wierzbickis agreed to pay Burd $75,000 for a house to be constructed according to agreed-upon specifications, to be completed by September 1, 1977.[1] Burd was unable to meet the completion date. Further, numerous alleged defects in the construction of the house caused the Wierzbickis to delay closing their contemplated loan from the Veterans' Administration (V.A.). Unable to obtain a satisfactory response from Burd, the Wierzbickis filed suit against Burd in August of 1978 seeking compensatory damages in excess of $30,000

---

1. Burd was evidently an experienced builder with a good reputation for the quality of his work. He had, however, neglected to renew his contractor's license for the year 1976–77 and was unlicensed, unbonded, and uninsured at all times relevant to this case.

and punitive damages in the amount of $280,000.[2]

In the meantime, the Bank had begun to press Burd for repayment of a construction loan in the amount of $259,200. This loan had been extended to Burd to cover the costs of constructing four houses, including the one he had contracted to sell to the Wierzbickis; it was secured by a deed of trust covering the four lots on which the houses were to be built.[3] The Bank finally determined that amicable resolution of the dispute between Burd and the Wierzbickis was unlikely. Thus, when the due date arrived for payment of the construction loan, it declared the loan to be in default.[4]

On August 24, 1979, the Wierzbickis instituted suit against the Bank, alleging, on the alternative theories alluded to at the outset, that the Bank was liable for Burd's failure to perform. At the same time, the Wierzbickis sought a temporary restraining order to halt the foreclosure sale; the superior court granted this relief, but conditioned its restraining order on the posting of a bond in the amount of $15,000, which the superior court viewed as an approximation of the value of their twenty-month rent-free occupancy of the house. The Wierzbickis failed to post the required bond and thus the foreclosure sale took place as scheduled.[5]

II. *Does a lending institution which extends a short-term construction loan to a developer owe a duty of care to prospective buyers of the homes built by the developer?*

The legal theory upon which the Wierzbickis seek recovery against the Bank is not readily discernible. Given the particular facts and circumstances of this case as developed for purposes of the summary judgment motion, we think the only basis for recovery advanced by the Wierzbickis which warrants discussion is that which urges adoption of the rule articulated by the Supreme Court of California in *Connor v. Great Western Savings and Loan Association,* 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968).[6]

*Connor* involved an elaborate development scheme in which the defendant lending institution, Great Western participated extensively. The project was initiated with an agreement whereby Great Western was to "warehouse" the land to be developed; because California statutes precluded it from making a loan of more than one-third of the value of the unimproved property, it "bought" the property from the developer at a low price and promised to sell it back as development progressed. In addition to the profit that was to be realized on this arrangement, Great Western was given the right to make all construction loans on the project as well as the right of first refusal to make long-term loans to the buyers of the homes. Great Western exercised substantial control over the project as it progressed. Two years after completion of the tract the developer's negligent construction caused the foundations of several homes to crack, resulting in extensive damage. *Id.* 73 Cal.Rptr. at 371–75, 447 P.2d at 611–15.

After rejecting the argument that Great Western was vicariously liable for the damage as a joint venturer with the developer, *id.* 73 Cal.Rptr. at 375–76, 447 P.2d at 615–16, the Supreme Court of California held that:

---

**2.** It appears that the Wierzbickis remained in the house from January of 1978 through October 1979, when they were informed that the V.A. had withdrawn approval of the $55,000 loan.

**3.** Burd completed and sold the other three houses without incident, and applied the proceeds from those sales against the balance due on his construction loan.

**4.** The Bank notified the Wierzbickis of that action on May 30, 1979, and scheduled a foreclosure sale for August 30, 1979.

**5.** The Bank was the only party to enter a bid at this sale, and foreclosed the property. It then proceeded to offer to sell the house to the Wierzbickis at its purchase price. The Wierzbickis decided not to accept the Bank's offer and apparently surrendered possession of the premises to it on October 15, 1979.

**6.** We have examined all of appellants' other theories advanced in support of their claims against the Bank and have found them devoid of merit.

'Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty.' *Id.* 73 Cal.Rptr. at 377, 447 P.2d at 617, *quoting Merrill v. Buck*, 58 Cal.2d 552, 25 Cal.Rptr. 456, 462, 375 P.2d 304, 310 (1962). The court listed six factors to be considered in determining whether such a duty exists:

'The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.'

*Connor*, 73 Cal.Rptr. at 377, 447 P.2d at 617, *quoting Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16, 19 (1958). A divided Supreme Court of California concluded that each of those factors operated against Great Western, and that it "had a duty to exercise reasonable care to prevent the construction

and sale of seriously defective homes to plaintiffs." *Connor*, 73 Cal.Rptr. at 378, 447 P.2d at 618.[7]

The *Connor* rule has not met with widespread acceptance. Subsequent cases have indicated that liability will be imposed on construction lenders only in unusual circumstances, where the lender's activities clearly exceed those of a normal money lender.[8] We need not decide whether we would have reached the same result as the California Supreme Court in *Connor* because the facts presented in this case are dramatically different from those in *Connor*.

Under the *Connor* rule it is necessary to consider whether the six *Biakanja* criteria upon which the California Supreme Court relied in imposing liability on Great Western have been met in this case. *Bradler v. Craig*, 274 Cal.App.2d 466, 79 Cal.Rptr. 401 (1969), involved facts closely analogous to those of the case at bar. Santa Barbara Savings had lent money to a builder for the purchase and development of five residential lots, exercising roughly the same degree of control over the construction as did the Bank in this case. *Id.* 79 Cal.Rptr. at 403. The court described the lending institution's activity as follows:

Santa Barbara's alleged participation was that of the usual and ordinary construction and purchase money lender,

---

**7.** Justice Mosk, in his dissent, wrote:

The lender, as a supplier of capital, is to receive by contract a fixed return or price for his investment. He owns no right to participate in the profits of the enterprise no matter how great they may be. On the other hand, he is insulated from the risk of loss of capital and interest in return for making his money available, other than the risk of nonpayment of the contract obligations. Indeed, it is elementary that the owner of money lends it to an entrepreneur and receives only a fixed return, rather than obtaining the gain from using the money himself as an entrepreneur, on the condition that he be relieved of risk. The basic, underlying risk in mortgage lending is that the lender might not get back what is owed to him in principal and interest.

It seems abundantly clear, both legally and logically, that if the lender has no opportunity to share in the profits or gains beyond the fixed return for his supplying of capital, i. e., if he has no chance of reaping the entrepreneur's reward and exercises no control over

the entrepreneur's business, elementary fairness requires that he should not be subjected to the entrepreneur's risks.

*Connor*, 73 Cal.Rptr. at 382, 447 P.2d at 622.

The court's decision in *Connor* also provoked a response by the state legislature. In 1969, a statute was enacted which rejected liability of lenders in this context "unless . . . loss or damage is a result of an act of the lender outside the scope of the activities of a lender of money or unless the lender has been a party to misrepresentation with respect to [the property involved]." *See* Cal.Civ.Code § 3434; P. Gutierrez, *Liability of a Construction Lender Under Civil Code Section 3434: An Amorphous Epitaph to Connor v. Great Western Savings & Loan Association*, 8 Pac.L.J. 1 (1977).

**8.** *Murry v. Western American Mortgage Co.*, 124 Ariz. 387, 604 P.2d 651, 653 (App.1979) ("Thus, although *Connor* has never been overruled, its holding in essence has been limited to its facts.").

content to lend money at interest on the security of real property. Approval of plans and specifications, and periodic inspection of houses during the construction is normal procedure of any construction money lender.[9]

*Id.* 79 Cal.Rptr. at 407. It went on to hold that, since the lending institution's behavior was "limited to that of a conventional construction lender," that institution's participation in the construction project was "so minimal and restricted that it had no effect on plaintiffs." *Id.* 79 Cal.Rptr. at 408. The court held, therefore, that the first *Biakanja* factor—which requires consideration of "the extent to which the transaction was intended to affect the plaintiff," *id.* 79 Cal. Rptr. at 406—was not present at all.

In the case at bar, there is no indication that the Bank's activities in this venture were intended to accomplish anything beyond protection of its investment in extending the construction loan to Burd. Its participation was in every way "limited to that of a conventional construction lender," *see Bradler,* 79 Cal.Rptr. at 408, and, under the *Connor* rule, was not sufficient to create a duty of care running to the Wierzbickis. In short, the facts of the instant case fail to demonstrate any conduct on the Bank's part which would furnish the basis for the Wierzbickis successfully asserting a claim for relief against the Bank. Thus, on the particular facts of this case, which fail to disclose any express or implied undertaking on the Bank's part which would inure to the Wierzbickis' benefit, we hold that the superior court's grant of summary judgment in favor of the Bank should be affirmed.[10]

Affirmed.

---

**9.** The following distinctions between the involvement of Santa Barbara Savings and that of the lending institution in *Connor* were noted:

Unlike *Connor,* its financing did not take on 'ramifications beyond the domain of the usual money lender.' Unlike *Connor,* it was not financing the development of a large tract wherein it sought to receive substantial fees for making construction loans. Unlike *Connor,* it did not receive a fee for 'warehousing' the land. Unlike *Connor,* it received no guarantee from loss of profits in the event a home buyer sought permanent financing elsewhere. Unlike *Connor,* it was not 'preoccupied with selling prices and sales.'

*Bradler,* 274 Cal.App.2d 466, 79 Cal.Rptr. at 407 (citations omitted).

**10.** The construction loan agreement between Burd and the Bank explicitly provided that the Bank's monitoring of the progress of the subject construction was solely to protect its own interest in maintaining adequate security for its loan. Paragraph 14 of the loan agreement provided:

The undersigned owner agrees that Bank is under no obligation to approve plans and specifications or to construct or supervise construction of said improvements and that the approval of plans and specifications and the inspection by Bank of the construction of said improvements is for the sole purpose of protecting the security of Bank and that such approval and inspection is not to be construed as a representation that there will be a strict compliance on the part of the builder with plans and specifications, or that the construction will be free from faulty material or workmanship, or in accordance with all pertinent laws and ordinances.

Paragraph 32 further provided:

This agreement does not, and shall not be construed as creating a join[t] venture or partnership between Owner and Lender, and nothing herein contained shall be deemed to constitute Owner the agent of Lender for any purpose.