**STATE of Alaska for the Use of Frederick L. SMITH, d/b/a Smith Masonry, and Frederick L. Smith, d/b/a Smith Masonry, Appellants,**

v.

**TYONEK TIMBER, INC., H & S Construction, Inc., and Maryland Casualty Company, Appellees.**

Nos. 7170, 7256.

Supreme Court of Alaska.

April 6, 1984.

Kenneth O. Jarvi, P.C., Anchorage, for appellants.

Richard E. Vollertsen, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellee Tyonek Timber, Inc.

R.R. DeYoung, Anchorage, for appellees H & S Construction, Inc. and Maryland Casualty Company.

Before BURKE, C.J., RABINOWITZ, COMPTON, and MOORE, JJ., and MOODY, Superior Court Judge.\*

## OPINION

MOORE, Justice.

This appeal involves contract and negligence claims by appellant Fred L. Smith (Smith), a concrete subcontractor, against appellees Tyonek Timber, Inc. (Tyonek), the manufacturer and supplier of concrete, H & S Construction, Inc. (H & S), the general contractor, and its surety, Maryland Casualty Co. (Maryland) for the replacement costs of a defective concrete floor slab.

The primary issues presented on this appeal are whether the trial court erred (1) in granting a directed verdict in favor of Tyonek precluding recovery for economic loss based on a negligence cause of action absent physical injury or property damage; (2) in granting summary judgment in favor of H & S and Maryland dismissing Smith's contract claims because he was an unregistered contractor in violation of AS 08.18.-011–.171; and (3) in holding that the Little Miller Act, AS 36.25.020, did not authorize an independent right of recovery for an unregistered contractor because AS 08.18.-151 barred such an action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 8, 1976, the Kenai Peninsula Borough contracted with H & S for the construction of an addition to the Bob Bartlett School in Tyonek, Alaska. H & S, in turn, awarded the subcontract for completion of the concrete and masonry work on the project to Smith.

The Tyonek school project was a public works project owned by the Kenai Peninsula Borough. Accordingly, H & S secured performance and payment bonds pursuant to AS 36.25.010, the Little Miller Act. Maryland was the named surety.

About the time of submission of his bid to H & S (February 1976), Smith requested that Homestate Insurance, an insurance and bonding agency in Anchorage, Alaska, "aid me in getting registered as a licensed and bonded contractor pursuant to AS 08.-18.011 *et seq.*" Smith stated that he proceeded to enter into the subcontract with H & S in reliance upon Homestate's indication to him that it would secure his certificate of registration.

Smith began work on the Tyonek project in late April, 1976. He stated that in September 1976, near the completion of the Tyonek project, Homestate "indicated that for some unknown reason the application had simply been overlooked and had not gone forward as I had earlier requested." Smith did not become a licensed contractor until November 1, 1976.

In March 1976, H & S tentatively decided to try to procure pre-mixed concrete for Smith's work from Tyonek Timber, Inc. In early May, Tyonek quoted a price of $180 per yard, which was subsequently lowered to $165 per yard. Smith's original overall bid price for the concrete and masonry work contemplated concrete supplied at $100 per yard. If concrete provided by someone other than himself exceeded $100 per yard, H & S was to pay for the excess in cost. Consequently, Tyonek's offer was rejected and Smith and H & S agreed that Smith would mix his own concrete for the project. From May through early July 1976, Smith mixed the concrete himself and

---

\* Moody, Superior Court Judge, sitting by assignment made pursuant to Article IV, section 16, of the Constitution of Alaska.

poured the foundation footings and block walls satisfactorily.

From July 7 to July 9, 1976, Tyonek delivered concrete to the project site.[1] Smith used this concrete; however, the concrete Tyonek provided later proved defective. In September, 1976, Smith performed the necessary remedial work. Tyonek later billed Smith at $165 per yard for the concrete it had delivered. Smith did not pay this bill but did charge H & S for the cost of the concrete in excess of $100 per yard.

Thereafter, Smith and H & S exchanged a series of invoices in which each party billed the other for the extra costs attributable to the delivery of the defective concrete and the subsequent replacement costs. In November 1976, Smith sued Tyonek for the replacement costs, alleging negligence for furnishing unfit concrete. Tyonek counterclaimed for the unpaid concrete.

In March 1978, Smith amended his original complaint to include H & S and its surety, Maryland. Smith sought recovery from them under both tort and contract theories. In the tort action, he sought to hold H & S liable for the economic loss Smith had suffered due to H & S' negligent inspection of the concrete supplied by Tyonek. Smith also sued under the Little Miller Act to recover amounts unpaid.

All three co-defendants asserted affirmatively that Smith's failure to comply with contractor registration requirements precluded his claims.

H & S was dissolved on September 30, 1980 for failure to file annual reports and pay corporate taxes and fees due.

On September 30, 1981 Judge Souter granted the summary judgment motion of H & S and Maryland to the extent that Smith sought recovery in *contract* on Counts II and IV but denied the motion to the extent that Smith sought recovery in *tort* on those counts. Summary judgment was also granted to defendants on Count III, the Little Miller Act claim.[2] The court so ruled as to all three counts because of Smith's noncompliance with the contractor's registration requirements of AS 08.-18.011–.171. AS 08.18.151 precludes actions based in contract by unregistered contractors.

Trial commenced October 5, 1981. The jury returned a special verdict on October 16, 1981 finding that no contract existed between Smith and Tyonek to pay for the delivery of concrete. The jury did find all three parties negligent in the following apportionment: Smith—15% negligent; Tyonek—18% negligent; H & S—67% negligent.[3]

Thereafter, Tyonek renewed its motion for a directed verdict. Tyonek contended that since Smith's damages consisted solely of economic losses, no tort recovery was available to Smith in the absence of privity of contract. The trial court found this a correct statement of law and granted judgment in favor of Tyonek.

Judge Souter entered a separate judgment in favor of Smith's negligence claim against H & S on August 16, 1982, in the

---

1. At trial the jury found that no contract existed between Tyonek and Smith which required Smith to pay for the contract delivery.

2. Smith's Memorandum in Opposition to (defendant's) Motion for Summary Judgment was also entitled Memorandum in Support of Cross Motion for Summary Judgment. It argued, to no avail, 1) that the Little Miller Act (AS 36.25.-010) is a separate cause of action unaffected by the registration requirements of AS 08.18.011, and 2) that Smith "substantially complied" with the latter. Smith's third argument, that non-registration did not bar *tort* actions by the contrac-

tor, was successful in that summary judgment was denied as to Smith's tort-based claims in Counts II and IV.

3. It awarded $5,413.73 against Tyonek and $20,-151.19 against H & S. Because the court and counsel were concerned that the jury had improperly discounted the monetary figures by the comparative negligence it had found, the jury was asked to reconsider its award. The jury subsequently awarded $9,000 against Tyonek and $53,000 against H & S. The negligence percentages remained the same.

principal sum of $45,500 and a separate judgment in favor of Tyonek as to Count I.

Appellant Smith appeals the directed verdict in favor of Tyonek arguing that despite his lack of privity with Tyonek, his replacement costs as a subcontractor are compensable in a negligence claim. Smith also appeals the summary judgment in favor of H & S and Maryland, on the contract and Little Miller Act claims, AS 36.25.020.

II. AFTER A JURY AWARDED SMITH DAMAGES BASED ON A NEGLIGENCE CAUSE OF ACTION, DID THE SUPERIOR COURT ERR IN GRANTING A DIRECTED VERDICT FOR APPELLEE, TYONEK, WHEN IT RULED THAT, ABSENT PRIVITY WITH TYONEK, SMITH COULD NOT RECOVER DAMAGES FOR NEGLIGENCE WHERE HE SOUGHT DAMAGES SOLELY FOR ECONOMIC LOSS?

■ Smith argues that a cause of action in tort should extend to purely economic harm sustained by one not in privity with the supplier of a defective product. He suggests that our prior decisions relative to this subject evidence a willingness to embrace his position. Smith is mistaken.

We already have had occasion to confront this issue in the context of a strict liability claim. In *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976), we disallowed recovery in strict liability in tort against a remote manufacturer for economic loss sustained by purchasers of a thoroughly defective mobile home.[4]

In reaching our decision, we adopted the approach of Chief Justice Traynor in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965) that recovery of economic loss should continue to be limited to contractual remedies. The vast majority of jurisdictions support the *Seely* position and have not permitted recovery of purely economic losses in products liability actions sounding in tort.[5]

In *Morrow* we reasoned that permitting recovery under strict liability in tort for economic loss would jeopardize rights granted a manufacturer by the legislature under the Uniform Commercial Code:

[T]his strict liability remedy would be completely unrestrained by disclaimer, liability limitation and notice provisions. Further, manufacturers could no longer look to the Uniform Commercial Code provisions to provide a predictable definition of potential liability for direct economic loss. In short, adoption of the doctrine of strict liability for economic loss would be contrary to the legislature's intent ... and would vitiate clearly articulated statutory rights. This we decline to do.

*Morrow v. New Moon Homes, Inc.*, 548 P.2d at 286 (footnotes omitted).

One year later, we unanimously reaffirmed *Morrow* while extending strict liability recovery to direct property damage. *Cloud v. Kit Manufacturing Company*, 563 P.2d 248 (Alaska 1977). Again, we concurred with the *Seely* position that direct physical injury to property and personal injury should be treated similarly. Admittedly, differentiating economic loss from property damage is not always an easy task. In *Cloud*, we noted that "sudden and calamitous" damages, such as the flammable padding fire which destroyed the Cloud's mobile home, generally identifies instances in which property damage is most likely to be found.

■ We further refined the distinction in *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324 (Alaska 1981).[6] Our attempts to clarify the

---

4. We did, however, dispense with the privity requirement in an action for direct economic loss attributable to a breach of implied warranty. *Morrow v. New Moon Homes, Inc.*, 548 P.2d at 291.

5. *See* n. 12 *infra*.

6. There, we held that:

[W]hen a defective product creates a situation potentially dangerous to persons or other properties, and loss occurs as a result of that danger, strict liability in tort is an appropriate theory of recovery, even though the damage is

distinction reflects a commitment "to draw the line between injuries which properly find their remedy in tort and those which are more appropriately governed by contract principles." *Id.* at 328. For the purpose of strict liability, recovery for economic loss is limited to contractual remedies. We discern no reason to disturb that holding now.

Smith suggests that he had a "property interest" in the concrete slab equal to $100 per yard. We find this contention meritless. The school floor slab is the property of the Kenai Borough. As a concrete subcontractor, Smith merely applied an inferior product in the course of his trade. He did not possess any ownership interest in the concrete product itself or in the completed school floor to which it was applied. Smith's losses were purely economic in nature.[7]

Smith argues primarily that recovery under a negligence theory, as distinct from recovery under a strict liability theory is appropriate in cases where, as here, mere economic harm is at issue. This is our first opportunity to directly address this question.[8]

Smith's argument turns primarily on the applicability of the *Biakanja* analysis. *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (1958). Smith first relies on *Wierzbicki v. Alaska Mutual Savings Bank,* 630 P.2d 998 (Alaska 1981) to open the door for his *Biakanja* analysis. *Wierzbicki* involved a negligence action by prospective purchasers of a new house against the bank which had extended a short-term construction loan to an experienced, yet unlicensed and uninsured, builder who was unable to meet the completion date. We determined that the only basis for recovery advanced by the Wierzbickis which warranted discussion was the rule articulated in *Connor v. Great Western Savings and Loan Association,* 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1969) where it was stated that:

> The determination whether in a specific case the defendant will be held liable [for failure to exercise ordinary care] to a third person not in privity [of contract] is a matter of policy and involves the balancing of various factors....

*Id.* at 617, (quoting *Biakanja v. Irving,* 320 P.2d at 19).

We noted in *Wierzbicki* that the *Connor* rule has not met with widespread acceptance and that subsequent cases have indicated that liability will only be imposed in unusual circumstances where the lender's activities clearly exceed those of a normal lender. *Wierzbicki v. Alaska Mut. Sav. Bank,* 630 P.2d at 1000. Accordingly, we affirmed summary judgment for the Bank because there was no "express or implied undertaking on the Bank's part which would inure to the Wierzbickis' benefit...." *Id.* at 1001.

*Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (1958) itself is a rather peculiar case on its facts. It involved an action by a beneficiary to an invalidly drawn will against a notary public who failed to have

---

confined to the product itself. In order to recover on such a theory plaintiff must show (1) that the loss was a proximate result of the dangerous defect and (2) that the loss occurred under the kind of circumstances that made the product a basis for strict liability. *Northern Power,* 623 P.2d at 329 (footnotes omitted).

7. The costs of replacing the slab here bear no resemblance to those sustained in *Shooshanian v. Wagner,* 672 P.2d 455 (Alaska 1984). In *Shooshanian* we found a claim for property damage because:

> The relevant complaint here is not that the Shooshanians received poor insulation for their money. Rather, they maintain that the incorporation of an allegedly toxic substance

in their building has physically altered it in a manner which makes it harmful to them, and that the physical damage to the property may be measured by the cost of repairing the walls to make them safe.

*Id.* at 464.

8. Appellant mistakenly asserts that we have completely dispensed with privity for negligent recovery. In *Howarth v. Pfeifer,* 443 P.2d 39 (Alaska 1968), we narrowly held that privity of contract was not the exclusive prerequisite to the maintenance of an action for negligent *misrepresentation* against an insurance agent by a property owner whose uninsured building was destroyed by fire.

the will properly attested. The two parties were not in privity of contract. In order to find negligence on the part of the notary public, the court offered the following six point balancing test:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. Cf. Prosser, Torts (2d ed. 1955), §§ 36, 88, 107, pp. 168, 172, 544–545, 747; 2 Harper and James, Torts (1956), § 18.6, p. 1052.

*Id.* at 19.

On the basis of the above six factors, the notary public was deemed to have negligently failed to have the will properly attested. The defendant was further admonished for his "highly improper conduct"— the unauthorized practice of the law.[9]

Tyonek argues on the basis of a host of citations [10] that *Biakanja* is a limited exception to the general rule precluding recovery for economic loss in negligence actions which applies only where 1) the defendant has breached a professional duty which normally requires a high standard of care; or 2) the defendant has entered into a contract, a purpose of which was to extend a benefit to the plaintiff as a third party beneficiary.[11]

Even if we consider the relationship between Smith and Tyonek a "special" one which requires a higher standard of care, the tortuous walk through the six point *Biakanja* test is futile. Smith cannot satisfy even the first factor of the *Biakanja* test, the extent to which the transaction was intended to affect the plaintiff. As a subcontractor, Smith's benefit from the contract between H & S and Tyonek for the supply of concrete would seem a consequential one at best, not an intended benefit critical to the contract as was the case in *Biakanja.*

From a broader perspective, we find *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982) helpful in its extensive discussion of the evolution of the law relating to privity and economic loss. *Moorman* held that a food processor could not recover against a manufacturer of a defective grain storage tank for economic loss under the tort theories of strict liability, or negligence or innocent misrepresentation for primarily the same reasons.

In its discussion of the majority rule that denies recovery under strict liability in tort for solely economic loss, *Moorman* includes citations to our decisions in *Morrow, Cloud* and *Northern Power.* *Id.* at 446 and 447. *Moorman* also notes that the

---

**9.** In *Biakanja,* the court stated that:
> Such conduct should be discouraged and not protected by immunity from civil liability, as would be the case if plaintiff, the only person who suffered a loss, were denied a right of action.

*Biakanja v. Irving,* 320 P.2d at 19.

**10.** *Union Oil Co. v. Oppen,* 501 F.2d 558, 566 n. 9 (9th Cir.1974); *United States v. Rogers & Rogers,* 161 F.Supp. 132, 135–6 (D.Cal.1958); *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, 687–89 (1961) *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *Cooper v. Jevne,* 56 Cal.App.3d 860, 128 Cal.Rptr. 724, 727–729 (1976); *A.R. Moyer, Inc. v. Graham,* 285 So.2d 397, 398–401 (Fla.1973); *Ryan v. Kanne,* 170 N.W.2d 395, 401–03 (Iowa 1969); *Baer v. Bro-*

der, 106 Misc.2d 929, 436 N.Y.S.2d 693, 694–96 (1981); *Devoto v. Pacific Fidelity Ins. Co.,* 618 F.2d 1340, 1350 (9th Cir.1980) *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Donald v. Garry,* 19 Cal.App.3d 769, 97 Cal.Rptr. 191, 192 (1971); *Goodman v. Kennedy,* 18 Cal.3d 335, 134 Cal.Rptr. 375, 378–82, 556 P.2d 737 (1976); *Weaver v. Superior Court,* 95 Cal. App.3d 166, 156 Cal.Rptr. 745, 751–54 (1979); *Clagett v. Dacy,* 47 Md.App. 23, 420 A.2d 1285, 1288–89, n. 2 (1980).

**11.** Indeed, this "special relationship" theory is arguably borne out in Alaska. *See Howarth v. Pfeifer,* 443 P.2d 39 (Alaska 1968); *Wierzbicki v. Alaska Mutual Savings Bank,* 630 P.2d 998 (Alaska 1981).

vast majority of cases [12] support the view against allowing recovery in negligence for economic losses and concluded:

> The policy considerations against allowing recovery for solely economic loss in strict liability cases apply to negligence actions as well. When the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery. [Citation omitted] Moreover, as was true with strict liability, if a manufacturer were held liable in negligence for the commercial loss suffered by a particular purchaser, it would be liable for business losses of other purchasers caused by the failure of its product to meet the specific needs of their businesses, even though the needs were communicated only to the dealer. [Citation omitted] Thus, a manufacturer could be held liable for damages of unknown and unlimited scope, even though the product is not unreasonably dangerous and even though there is no damage to person or property.

> As discussed above, the UCC provides the proper framework for a purchaser's recovery of economic losses. Allowing an aggrieved party to recover under a negligence theory for solely economic loss would constitute an unwarranted infringement upon the scheme provided by the UCC. We have already concluded that plaintiff, in this case, has suffered solely economic loss. Consequently, it

cannot recover damages under a negligence theory.

*Id.* at 451–452 (emphasis added).

We do not ignore the small minority of jurisdictions which have rejected the contract versus tort distinction in specific cases. On the contrary, we note that these cases involved consumers who possessed a manifest ownership interest in the defective product and also suffered critical losses as a result of the defect which threatened their livelihood.[13] Smith's circumstances simply do not approach those peculiar to this category of aggrieved consumers.

■ Consequently, we hold that Smith's lack of privity with Tyonek precludes his recovery for pure economic loss based upon a negligence theory. We affirm the trial court's order granting appellee Tyonek's motion for directed verdict on this issue.[14]

### III. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT TO APPELLEES H & S AND MARYLAND WHEN IT RULED THAT APPELLANT'S FAILURE TO COMPLY WITH THE CONTRACTOR REGISTRATION REQUIREMENTS OF AS 08.18.011–.171 PRECLUDED HIS RECOVERY ON ALL CONTRACT CLAIMS?

■ AS 08.18.011 makes it unlawful to submit a bid or work as a contractor until one has satisfied the conditions requisite to the issuance of a certificate of registration.[15] At the time of applying for a certifi-

---

**12.** *Moorman,* 435 N.E.2d at 451.

**13.** *Berg v. General Motors Corp.,* 87 Wash.2d 584, 555 P.2d 818 (1976) (commercial fisherman who purchased a defective vessel engine could recover in a negligence claim against the manufacturer for the lost profits of his anticipated fish catch); *State ex rel. Western Seed Production Corp. v. Campbell,* 250 Or. 262, 442 P.2d 215 (1968) (sugar beet grower could recover in negligence against a foreign seed supplier for crop losses *and* unusuable crop land due to defective seed); *W.R.H., Inc. v. Economy Builders Supply,* 633 P.2d 42 (Utah 1981) (contractor/owner of apartment complexes could recover in negligence against the manufacturer of plywood sid-

ing for economic loss resulting from product delamination *but* only in conjunction with property damages.

**14.** Accordingly, we do not reach appellant's challenge of the trial court's decision not to enter judgment jointly and severally against H & S and Tyonek. As a result of the directed verdict, no compensable claims against Tyonek remained.

**15.** AS 08.18.011 provides in pertinent part:

> It is unlawful for a person to submit a bid or work as a contractor until that person has been issued a certificate of registration by the

cate, each applicant is required to post a surety bond [16] and provide evidence of public liability and property damage insurance.[17]

The bonds, required as a prerequisite to contractor certification, "guarantee payment of his employee's wages, taxes, suppliers, for any breach of contract and any damage done to public facilities." [18]

The statutorily imposed penalty for noncompliance is unambiguous. The contractor is barred from suing on the contract in which he has irresponsibly engaged. AS 08.18.151 provides:

Legal actions by contractor. *A person acting in the capacity of a contractor may not bring an action* in a court of this state *for the collection of compensation for the performance of work or for breach of contract* for which registration is required under this chapter without alleging and proving that the contractor was a registered contractor at the time of contracting for the performance of the work.

(Emphasis added).

There is no question regarding the applicability of AS 08.18.151 to Smith's contract claims.[19] Sometime in February 1976 Smith submitted a bid to H & S for concrete and masonry work. He was awarded the contract on April 1, 1976. It is undisputed that as of April 1, 1976 Smith had not yet (1) submitted an application for

registration with the Department of Commerce and Economic Development, (2) filed the required surety bond, or (3) obtained public liability and property damage insurance for approval by the commissioner. Smith completed this job in late September, 1976. He became a registered contractor on November 1, 1976 and commenced this lawsuit on November 12, 1976.

To avoid the penalty for noncompliance Smith argues substantial compliance with the registration requirements of AS 08.18.-151 on the basis that (1) in February 1976 he requested his insurance broker "aid me in getting registered as a licensed and bonded contractor....", (2) due to an oversight by his broker he was advised on September, 1976 that his application had been overlooked, and (3) subsequently, he became a licensed contractor on November 1, 1976.

Smith cannot rely on his mistaken belief that his broker would timely process his application for registration as a licensed and bonded contractor to support his claim of substantial compliance. *General Insurance Company of America v. Superior Court,* 26 Cal.App.3d 176, 102 Cal.Rptr. 541, 542 (1972). The burden of compliance under AS 08.18.011–.171 is solely the responsibility of the unlicensed contractor. Smith's argument here is totally without merit. We affirm the trial court's decision on this issue.

Department of Commerce and Economic Development.

16. AS 08.18.071 provides in pertinent part:
(a) Each applicant shall, at the time of applying for a certificate of registration, file with the commissioner a surety bond running to the State of Alaska....

17. AS 08.18.101 provides in pertinent part:
Each applicant, at the time of applying for registration, shall file with the commissioner satisfactory evidence that the applicant has in effect public liability and property damage insurance....

18. *Balboa Ins. Co. v. Senco Alaska, Inc.,* 567 P.2d 295, 296–7 (Alaska 1977) (quoting Report of the

Judiciary Committee on HCS for Senate Bill No. 161, 1968 House Journal at 545); *Industrial Power v. Western Modular Corp.,* 623 P.2d 291, 297 (Alaska 1981).

19. Fourteen express exemptions to the registration requirements for construction contractors are enumerated in AS 08.18.161. Much of the case law in Alaska concerning this chapter involves the application of these exemptions. *E.g., Olsen & Sons Logging, Ltd. v. Owens,* 607 P.2d 949 (Alaska 1980) (federal sites; logging; suppliers); *Balboa Ins. Co. v. Senco Alaska, Inc.,* 567 P.2d 295 (Alaska 1977) (sale of items not fabricated into structure); *Industrial Power v. Western Modular Corp.,* 623 P.2d 291 (Alaska 1981) (supplier of prefabricated items not installed).

IV. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF H & S AND MARYLAND ON THE BASIS THAT THE LITTLE MILLER ACT, AS 36.25.020, DID NOT PERMIT AN INDEPENDENT RIGHT OF RECOVERY ON SMITH'S CONTRACT CLAIMS?

Smith argues that despite his failure to comply with the express mandate of one statute, his contract claims against H & S and Maryland should not be foreclosed because he is afforded an independent remedy under a different statute. The question of statutory construction before us is whether the Little Miller Act, AS 36.25.020, authorizes an independent right of recovery notwithstanding the forfeiture provision of AS 08.18.151. The question of whether the longstanding, public works remedial statute is subject to the express forfeiture provision of the registration statute is one of first impression.[20]

Smith argues primarily that AS 08.18.151 and AS 36.25.020 can be interpreted as two parallel but independent statutes. We disagree.

The Little Miller Act,[21] AS 36.25.010–025, requires that the primary contractor (in this case H & S) on a public works project post a bond to the state or political subdivision thereof "for the protection of *all persons* who supply labor and material in the prosecution of the work provided for in the contract...."[22] (Emphasis added). The award of the contract is conditioned upon the furnishing of this bond.

AS 36.25.020(a) "Rights of persons furnishing labor or material" provides:

> *A person who furnishes* labor or material in the prosecution of the work provided for in the contract for which a payment bond is furnished ... *may sue* on the payment bond for the amount unpaid at the time of the suit.

(Emphasis added).

The purpose of the statute is clear: to protect laborers and materialmen on public work projects, as well as subcontractors, from the risks of nonpayment. It provides them a specific right of recovery on the payment bond in exchange for the assurance that material and labor will be readily furnished for state projects. Those who furnish labor and materials do so in reliance upon the existence of a valid payment bond. *State v. Neal and Sons, Inc.,* 489 P.2d 1016, 1020 (Alaska 1971).

AS 36.25.020(c) also provides, in pertinent part, that:

> A suit brought under this section shall be brought in the name of the state or the political subdivision of the state for the use of the person suing in the superior court.... The state or political subdivi-

---

**20.** The trial court noted the absence of any express statutory exemption for Little Miller Act plaintiffs in the contractor registration statute, AS 08.18.161.

**21.** The Little Miller Act was last amended in 1982. The registration statute was last substantively amended in 1968; however, grammatical changes were made in 1982.

**22.** AS 36.25.010 provides in pertinent part:
Bonds of contractors for public buildings or works. (a) Before a contract exceeding $2,000 for the construction, alteration, or repair of a public building or public work of the state or a political subdivision of the state is awarded to a general or specialty contractor, the contractor shall furnish to the state or a political subdivision of the state the following bonds, which become binding upon the award of the contract to that contractor:

(1) a performance bond with a corporate surety qualified to do business in the state, or at least two individual sureties who shall each justify in a sum equal to the amount of the bond; the amount of the performance bond shall be equivalent to the amount of the payment bond;

(2) a payment bond with a corporate surety qualified to do business in the state, or at least two individual sureties who shall each justify in a sum equal to the amount of the bond *for the protection of all persons who supply labor and material in the prosecution of the work provided for in the contract....*
(Emphasis added).
This is how the statute read in 1976 when Smith failed to furnish a bond. In 1982, AS 36.25.-010(a) was amended to change the amount of $2,000 *to* $10,000.

sion of the state is not liable for the costs or expenses of the suit.

The Act recognizes no exemptions to its coverage.

 The Little Miller Act is the stepchild of the Federal Miller Act, 40 U.S.C. § 270a–270d, and is substantially similar in all respects. *Hyundai Constr. Co. v. Kalmbach, Inc.*, 502 P.2d 856 (Alaska 1972). The Alaska Act, like the Federal Act, is clearly remedial in nature. There is no question that a remedial statute is to be liberally construed to effectuate its purposes.[23]

Smith argues that as "a person who furnishes labor....", he is literally[24] entitled to a right of recovery independent of the forfeiture provision of AS 08.18.151. Appellant has not proffered, nor are we aware of, any case law in direct support of his position.[25]

 We are mindful that statutes which cause forfeiture are not favored. We have not given penalty provisions such as AS 08.18.151 broad or liberal interpretations. "Public policy precludes giving this statute anything but a literal reading." *Industrial Power v. Western Modular Corp.*, 623 P.2d 291, 294, 297 (Alaska 1981).

Because the legislature has clearly mandated the penalty provision to enforce the statutory policy of AS 08.18.151 we have consistently enforced it:

> [T]he legislature chose the closing of the doors of the courts *as a fundamental tool to enforce its policy* of ensuring competence and financial responsibility in those who undertake work as contractors. *We are bound to enforce* the legis-

lative policies as we find them expressed in AS 08.18.011 et seq. Anyone engaged in building trades must be charged with awareness of the pervasive system of licenses and permits designed to enhance the public safety and confidence in the industry. Engrafting equitable exemptions onto the enforcement policy at best aids the ignorant and gullible, whom the legislature sought to regulate, and at worst creates fertile fields for sharp practice.

*Sumner Development Corp. v. Shivers*, 517 P.2d 757, 763 (Alaska 1974) (emphasis added).

 Accordingly, we now hold that Little Miller Act recovery, AS 36.25.020, is subject to, and not independent of, the express penalty of AS 08.18.151 which prohibits those contractors who fail to duly register from suing on the contracts in which they are unlawfully engaged. To so hold underscores the legislative intent of the registration statute while not unduly burdening those who work on public projects. To do otherwise circumvents the express purpose of the penalty provision and this we decline to do. Our decision is not meant to detract from the important protections afforded by the Little Miller Act to those who lawfully work on public projects.

We affirm the trial court's order granting summary judgment to H & S and Maryland on this issue.

AFFIRMED.

---

23. *See Anchorage Independent School District v. Anchorage Installation Co.*, 1 Alaska L.J. 6 (1963); *United States v. Carter*, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957); 3 C. Sands, Sutherland Statutory Construction § 60.01, at 29 (4th ed. 1974).

24. We note that AS 08.18.151 states that "a *person* acting in the capacity of a contractor ...." may not sue on the contract for which he was unregistered.

25. Federal case law is of negligible assistance; since there is no federal contractor registration

statute, the possibility of a conflict with the (federal) Miller Act does not exist.

In *Whipple v. Fuller*, 5 Utah 2d 211, 299 P.2d 837 (1956), upon which Appellant substantially relied in his brief, the Utah licensure statute, unlike that in the instant case, did not contain an express penalty provision which precluded the contractor from suing on the contract. The *Whipple* court apparently decided that penalizing the homeowner pursuant to an express statutory provision was more important than penalizing the unlicensed subcontractor, absent an express statutory provision.