**SKW/ESKIMOS, INC. and General Insurance Company of America, Appellants,**

v.

**SENTRY AUTOMATIC SPRINKLER COMPANY, a foreign corporation, Appellee.**

**No. S–1109.**

Supreme Court of Alaska.

Sept. 5, 1986.

Paul W. Waggoner, Anchorage, for appellants.

Thatcher R. Beebe, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

OPINION

This appeal arises out of an action which was brought by a sub-subcontractor to recover on a prime contractor's surety bond, for materials it used in performing its sub-subcontract. At issue is whether the sub-subcontractor can recover for materials when the bonded contract bound the prime contractor to furnish labor only.

FACTS.

In June 1979, the North Slope Borough ("NSB") entered into a contract with SKW/Eskimos, Inc. ("SKW"). SKW agreed to provide the administration, superintendence, and labor to build the Barrow High School Complex.

SKW's duties under the contract were set forth in Article 3. Specifically, SKW was required to:

    3.1.1 Furnish all labor, insurance, taxes, tools, subsistence, equipment, transportation, communications, and miscellaneous expendable items required for the construction of the project.

    3.1.2 Cooperate and work with the Architect and the material supplier for efficient, economical construction of the project.

    3.1.3 Prepare a cost estimate for the project after receiving construction drawings, technical specifications and a material package cost from H.W. Blackstock.

    . . . .

    3.1.6 Provide site supervision for construction, material receiving, material control, and the general efficient control of the work.

    . . . .

    3.1.8 Obtain subcontractors for specialty work.

The contract specifically stated that the contractor would not be responsible for "[t]he materials incorporated in the work,

which are to be supplied to the site by H.W. Blackstock under a separate agreement with the owner."

Article 9 specified the costs for which SKW would not be reimbursed:

9.1 The term Cost of the Work shall not include any of the items set forth below in this Article 9.

. . . .

9.1.6 Materials supplied by Owner via H.W. Blackstock.

The contract also required SKW to provide performance and payment bonds.

H.W. Blackstock Company ("Blackstock") of Seattle apparently provided most of the materials for the project. The record does not contain a written contract between NSB and Blackstock, but the record does indicate that such an agreement existed. The contract between NSB and SKW refers to "[t]he materials incorporated in the work, which are to be supplied to the site by H.W. Blackstock under a separate agreement with the owner." The record also contains purchase orders for materials from Blackstock, listing "Barrow High School" as the customer name or project.

In August 1979, SKW secured the payment bond required under the terms of its contract with NSB. General Insurance Company of America ("General Insurance") was the surety. The bond provided:

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly make payment to all claimants as hereinafter defined, for all *labor and material* used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1. A claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for *labor, material, or both, used or reasonably required for use in the performance of the Contract,* labor and material being construed to include that part of water, gas, power, light, heat, oil,

gasoline, telephone service or rental of equipment directly applicable to the Contract.

[Emphasis added.]

In June 1980, SKW entered into a subcontract with Skoglund Company, Inc. ("Skoglund") for the installation of the entire mechanical system. Article 2 of the subcontract required Skoglund to furnish all labor for the mechanical portion of the project, but specifically excluded materials:

The Subcontractor and the Contractor agree that the materials and equipment to be furnished and work to be done by the Subcontractor are:

To furnish all labor, insurance, taxes, bonds, tools, equipment, supplies, freight, transportation, and all other items of expense ... necessary for and incidental to performing all operations in connection with installation of the entire mechanical system. . . .

All permanent materials will be furnished to the job site by others. . . . NOTE: A separate purchase order will be issued to Skoglund Company, Inc. for materials for Section 15500, Fire Protection from H.W. Blackstock Company.

The subcontract also required Skoglund to secure a payment bond in the amount of 100% of the subcontract amount prior to the commencement of work. In July 1980, Skoglund purchased the payment bond from Industrial Indemnity Company ("Industrial Indemnity"). The bond provided protection against Skoglund's failure to pay for "all labor performed and materials furnished in the prosecution of the work provided for under the terms of the said subcontract agreement."

In October 1980, Skoglund entered into a sub-subcontract with Sentry Automatic Sprinkler Company ("Sentry") for the installation of a system of automatic sprinklers for fire protection on the project. The contract required Sentry to provide both labor and materials for the installation of this system:

The Subcontractor and the Contractor agree that the materials and equipment

to be furnished and work to be done by the Subcontractor are:

To furnish all labor, materials, insurance, taxes, tools, equipment, supplies, freight, transportation and all other items of expense ... necessary for and incidental to performing all operations in connection with installation of the entire dry sprinkler and Halon Fire Protection system....

The materials provided by Sentry were furnished through Sentry's fabrication shop in Tacoma, Washington. Under its contract with Skoglund, Sentry was responsible for delivering these materials to Blackstock in Tukwilla, Washington, whereupon Blackstock would ship the materials to the job site. Sentry would bill Skoglund for the costs involved, and Skoglund would pay all Sentry's material and labor bills. Skoglund would then forward the materials portion of the bill to Blackstock for reimbursement.

In June 1983, Sentry completed the performance of its work under the terms of its sub-subcontract. When Sentry completed the work, it had outstanding bills of $166,455.70 for labor and $45,107.01 for "mobilization."[1] Thereafter Sentry served a Notice of Claim on SKW for recovery of all money owed on the project. In response thereto SKW directed Industrial Indemnity, Skoglund's surety, to pay Sentry all sums owed for labor and material provided on the project. Despite these notices and demands, Sentry was not paid the outstanding balance.

Subsequently, Sentry filed a complaint against Skoglund, SKW, NSB, General Insurance, and Industrial Indemnity. Sentry asserted, among other claims, that it was entitled to recover the outstanding sums under the provisions of the Alaska Miller Act, AS 36.25.010–.025 (the "Little Miller Act"). On May 9, 1984, Skoglund filed a petition for Chapter 11 bankruptcy proceedings. The superior court subsequently ordered a stay of all proceedings in this action as to Skoglund only.

After the entry of the stay Sentry moved for summary judgment against the remaining four parties. Sentry claimed that it was entitled to recover the money owed it under the terms of SKW's payment bond. The superior court granted partial summary judgment to Sentry against SKW for the labor portion of the claim, totalling $166,485.70, holding that Sentry was entitled to recover this under the provisions of the payment bond provided by SKW. The superior court subsequently awarded Sentry summary judgment against SKW for the remaining $45,107.01. The court based this award on the purpose of the Little Miller Act and on the language of the SKW-General Insurance bond, which stated that the bond covered "all labor and material used or reasonably required for use in the performance of the Contract...." It concluded that both the language of the statute and the terms of the payment bond were sufficiently broad to encompass materials supplied by Sentry in light of the fact that these materials were *"used"* in the performance of SKW's obligations under its contract with NSB.

On appeal, SKW and General Insurance Company (collectively referred to as "SKW") argue that the scope of the bond must be limited to the scope of the contract for which it was secured; therefore since SKW was not responsible for materials under its contract with NSB, the bond secured for the contract cannot cover materials.

CAN A SUB–SUBCONTRACTOR RECOVER ON THE PRIME CONTRACTOR'S PAYMENT BOND FOR MATERIALS PROVIDED BY THE SUB–SUBCONTRACTOR, WHEN THE CONTRACT (BETWEEN THE PRIME CONTRACTOR AND THE OWNER) COVERED BY THE BOND WAS FOR LABOR ONLY?

The issue in this case is whether SKW or its surety are responsible for costs of materials supplied by a sub-subcontractor when

---

1. The parties do not explain this term except to say that it includes both materials and "services other than materials." The parties do not dispute the amount owed, however.

SKW was responsible only for labor under its contract with the owner. We hold that a surety cannot be held liable beyond the scope of the principal's duty, and therefore reverse the superior court.

SKW argues that since its original contract with NSB states that it was not responsible for providing materials, a subcontractor cannot recover for materials on SKW's payment bond. SKW points out that the cost of the materials was not absorbed through the chain of contracts from Sentry through SKW up to NSB, but rather that Skoglund was paid by Blackstock for the materials that Sentry used. Therefore not only did SKW not contract to supply materials, under the system of payment arranged by NSB, Skoglund, and Blackstock, SKW never accepted any responsibility for payment. SKW was bypassed in the payment process for materials.

SKW further argues that Sentry was a sub-subcontractor to SKW only for the labor it performed; it could not be a sub-subcontractor for the materials it supplied because a subcontractor by definition is "[o]ne who takes portion of a contract from principal contractor or another subcontractor." Black's Law Dictionary 1277 (rev. 5th ed. 1979) SKW maintains that the language of the bond referring to labor, material, or both, "used or reasonably required for use in the performance of the contract" was intended as a restriction of the scope of a subcontractor's claim. It was intended to mean that there must be some generalized showing that the materials for which the claim is made were used in the project, not that materials not included in the contract are included in the bond's coverage.

Sentry argues that the undisputed facts lead to the conclusion that the superior court was correct. Skoglund worked on the project solely under the terms of its subcontract with SKW. Likewise, Sentry provided labor and materials for the project solely under the terms of its sub-subcontract with Skoglund. The payment bond secured by SKW specifically stated that it was to protect subcontractors providing both labor and materials on the project. Finally, the payment bond secured by SKW under the terms of its contract with NSB was the only payment bond secured for this project. Sentry maintains that the contract required SKW to "supply and supervise ... all subcontractors on the project," and that the bond therefore provided protection for all subcontractors furnishing labor and materials for the project.

Under AS 36.25.010(a)(2) of the Little Miller Act,[2] a contractor for a public works project must provide the relevant political subdivision with a payment bond[3] "for the

2. AS 36.25.010 provides in relevant part:
   *Bonds of contractors for public buildings or works.* (a) Except as provided in AS 44.33.-300, before a contract exceeding $100,000 for the construction, alteration, or repair of a public building or public work of the state or a political subdivision of the state is awarded to a general or specialty contractor, the contractor shall furnish to the state or a political subdivision of the state the following bonds, which become binding upon the award of the contract to that contractor:
   (1) a performance bond with a corporate surety qualified to do business in the state, or at least two individual sureties who shall each justify in a sum equal to the amount of the bond; the amount of the performance bond shall be equivalent to the amount of the payment bond;
   (2) a payment bond with a corporate surety qualified to do business in the state, or at least two individual sureties who shall each justify in a sum equal to the amount of the bond for

the protection of all persons who supply labor and material in the prosecution of the work provided for in the contract; when the total amount payable by the terms of the contract is not more than $1,000,000, the payment bond shall be in a sum of one-half the total amount payable by the terms of the contract; when the total amount payable by the terms of the contract is more than $1,000,000 and not more than $5,000,000, the payment bond shall be in a sum of 40 percent of the total amount payable by the terms of the contract; when the total amount payable by the terms of the contract is more than $5,000,000, the payment bond shall be in the sum of $2,500,-000.

3. Under this type of statute, the contractor is required to post two bonds. The payment bond serves to protect the subcontractors and the performance bond serves to protect the government against the contractor's failure to perform. *Sun Insurance Co. of New York v. Diversified*

protection of all persons who supply labor and material in the prosecution of the work provided for in the contract." This statute, like the federal Miller Act, is remedial in nature and is to be liberally construed to effectuate its purpose. *State ex rel. Smith v. Tyonek Timber, Inc.*, 680 P.2d 1148, 1157 (Alaska 1984). The purpose of the statute is:

> to protect persons who furnish labor or material for a state public works project from the risks of nonpayment. In exchange for providing such protection the state is assured that material and labor will be readily furnished for its projects. Persons who furnish labor and materials for the state's projects do so in reliance on the existence of a valid payment bond.

*State v. Neal & Sons, Inc.*, 489 P.2d 1016, 1020 (Alaska 1971).

Although the federal Miller Act and Alaska's Little Miller Act are remedial in character and should be liberally construed, the liability of the surety is not extended or enlarged beyond the contractual obligations of the contractor who remains primarily liable under the statute. 10 S. Williston, A Treatise On The Law of Contracts § 1211A, at 691–92 (3rd ed. 1967). Here, SKW was contractually obligated only to furnish labor, and was required by statute to post a bond only as to the work required by the contract. The statute states that a contractor must provide a payment bond covering "all persons who supply labor and material *in the prosecution of the work provided for in the contract.*" AS 36.25.010(a)(2) (emphasis added). The NSB/SKW contract specifically provided that "[t]he Contractor will not be responsible for … [t]he materials incorporated in the work, which are to be supplied to the site by H.W. Blackstock under a separate agreement with the owner."

A surety can only reasonably guarantee a contractor's performance if it can foresee the limits of the contractor's obligations. The only way it can assess the contractor's potential liability is to examine the original contract. General Insurance could not have foreseen that it would be guaranteeing payment for materials to Sentry because the NSB/SKW contract neither called for SKW to furnish materials for the sprinkler system nor provided for reimbursing SKW for such materials. In fact, SKW was completely removed from and had no control over the process by which Sentry was paid for the materials it furnished. Under its contract with Skoglund, Sentry would deliver the materials to Blackstock in Washington and Blackstock would ship them to the job site. Sentry would bill Skoglund for these materials, and Skoglund would pay the bill. Skoglund would then be reimbursed by Blackstock. It would make no sense for SKW to guarantee payment for these materials when it was not being reimbursed for them by NSB.[4]

Even if a surety could be held liable beyond the obligations imposed by the contract, in this case the bond by its own terms is limited to the contract. It covers "all labor and material used or reasonably required for use *in the performance of the Contract*" (emphasis added). The trial court assumed that materials used by Sentry were "used in the performance of the contract" and found that therefore Sentry could recover on the bond. Sentry, however, was a subcontractor to SKW only as to labor. Sentry's agreement to supply materials was not a duty delegated from Skoglund's or SKW's contract; it would result in a strained construction to consider Sentry's supplying materials as part of "the performance of the [NSB/SKW] Contract."[5]

REVERSED.

Engineers, Inc., 240 F.Supp. 606, 608 (D.Mont. 1965).

**4.** As SKW points out, when a prime contractor is ultimately responsible for providing materials and delegates this obligation to a subcontractor, it can assure payment to material suppliers or to sub-subcontractors by issuing joint checks to the subcontractors.

**5.** Sentry emphasizes the fact that SKW was the prime contractor for the project. SKW counters that projects can have more than one prime contractor, implying that Blackstock also should

W.M.F., Appellant,

v.

be considered as such. This dispute is irrelevant at this stage of the project, however. SKW secured a payment bond to cover its contract, and thus fulfilled the requirements of AS 36.25.-010. Obviously, the project had a gap in coverage; nevertheless, SKW is not liable for the cost of the materials when its contract specifically

stated that it was not responsible for supplying them.

